# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DEREK AMARAL, Individually and on behalf :
of all current and former similarly-situated :
employees of Defendants, :
    *Plaintiff,* :
                                      :
v.                                       :    C.A. NO. 1:12-CV-11583-DPW
                                      :
ADVANTAGE WEATHERIZATION, INC. :
and JOHN KELLY, :
    *Defendants.* :

## DECLARATION OF DEREK AMARAL IN SUPPORT OF PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND COURT FACILITATION OF NOTICE TO COLLECTIVE ACTION CLASS MEMBERS

Having been duly sworn, I, Derek Amaral, do depose and state:

1. My name is Derek Amaral, and my home address is 456 Bullock Street, Fall River, Massachusetts 02720.

2. I have personal knowledge of the facts set forth herein and, if called upon, could and would competently testify thereto under oath.

3. I worked at Advantage Weatherization, Inc. ("Advantage") from approximately June 27, 2010 to approximately December 8, 2011.

4. Advantage owns and operates a business primarily engaged in the installation of weatherproofing materials in residential buildings. John Kelly is the President and a Director of Advantage.

5. I worked out of the Brockton, Massachusetts location.

6. During my tenure at Advantage, I worked as a manual laborer installing weatherproofing in residential buildings throughout Massachusetts ("Weatherization Job Sites"). I specialized in installing insulation in attics, although I also performed other manual labor tasks. Additionally, for a short period of time during my employment at Advantage, I was required to perform landscaping and other non-weatherization work.

1

7. I signed the agreement to become a member of Residential Weatherization Local Union 7 ("Local 7") on or about September 10, 2010.

8. After the organization of Local 7, all of my similarly-situated coworkers became members of Local 7.

9. Upon information and belief, Advantage and Advantage management labeled as "Field Employees" all hourly paid workers, including me and my similarly-situated coworkers, who performed manual labor installing weatherproofing at various Weatherization Job Sites.

10. During my tenure at Advantage, I reported to and was supervised by supervisors including Joe Lambalot and Brian Machado.

11. During my tenure at Advantage, similarly-situated employees reported to and were supervised by supervisors including Joe Lambalot and Brian Machado.

12. During my tenure at Advantage, I was paid on an hourly basis.

13. During my tenure at Advantage, similarly-situated employees were paid on an hourly basis.

14. When I worked as a weatherization worker between June 2010 and June 2011, I was routinely required by my supervisors to arrive at Advantage's Brockton, Massachusetts warehouse ("Brockton Warehouse") at the start of each workday.

15. When I worked as a weatherization worker between June 2010 and June 2011, I observed that similarly-situated employees were routinely required by their supervisors to arrive at the Brockton Warehouse at the start of each workday.

16. When I worked as a weatherization worker between June 2010 and June 2011, after arriving at the Brockton Warehouse, I learned where my assignment was and with whom I would be working for the day. Also, while I was at the Brockton Warehouse in the morning, a supervisor or crew chief routinely provided me with a list of materials and equipment necessary for the day's weatherization work; I was expected and required to, and did, help gather such materials and equipment and load such materials and equipment into Advantage vehicles.

17. When I worked as a weatherization worker from June 2010 to June 2011, I observed that, after arriving at the Brockton Warehouse, similarly-situated employees learned

where their assignments were and with whom they would be working for the day. Also, while similarly-situated employees were at the Brockton Warehouse in the morning, a supervisor or crew chief routinely provided them with lists of materials and equipment necessary for the day's weatherization work; similarly-situated employees were expected and required to, and did, help gather such materials and equipment and load such materials and equipment into Advantage vehicles.

18. When I worked as a weatherization worker from June 2010 to June 2011, after helping load the Advantage vehicle, I routinely had to travel in the Advantage vehicle to the Weatherization Job Site, either as a passenger or a driver, with the goal of arriving at the job site at 8:00 a.m.

19. When I worked as a weatherization worker from June 2010 to June 2011, I observed that, after helping load Advantage vehicles, similarly-situated employees routinely had to travel in an Advantage vehicle to the Weatherization Job Site, either as passengers or drivers, with the goal of arriving at the job site at 8:00 a.m.

20. When I worked as a weatherization worker from June 2010 to June 2011, after arriving at the Weatherization Job Site, I routinely worked installing weatherproofing materials from approximately 8:00 a.m. until approximately 4:30 p.m., with only one 30 minute break for lunch. On some occasions, if a job was completed early or inclement weather prevented weatherization work, weatherization work ended earlier than 4:30 p.m. On a few occasions, weatherization work continued past 4:30 p.m.

21. When I worked as a weatherization worker from June 2010 to June 2011, I observed that, after arriving at the Weatherization Job Site, similarly-situated employees routinely worked at various manual labor tasks involved in installing weatherproofing materials from 8:00 a.m. until 4:30 p.m., with only one 30 minute break for lunch. On some occasions, if a job was completed early or inclement weather prevented weatherization work, weatherization work ended earlier than 4:30 p.m. On a few occasions, weatherization work continued past 4:30 p.m.

22. When I worked as a weatherization worker from June 2010 to June 2011, after the Weatherization Job Site was clean and the Advantage vehicle was loaded, I routinely had to travel back to the Brockton Warehouse in an Advantage vehicle, as either a passenger or driver.

23. When I worked as a weatherization worker from June 2010 to June 2011, I observed that, after the Weatherization Job Site was clean and the Advantage vehicle was

3

loaded, similarly-situated employees routinely had to travel back to the Brockton Warehouse in an Advantage vehicle, as either passengers or drivers.

24. When I worked as a weatherization worker from June 2010 to June 2011, routinely after arriving back at the Brockton Warehouse, I was required by my supervisors to secure equipment in specific areas in the warehouse (including parking the company vehicle if I was driving, storing the vehicle keys and camera equipment in the office, bringing the insulation tanks into the warehouse when the weather was cold, and/or placing the two-way radios back on chargers) prior to leaving work in my own vehicle.

25. When I worked as a weatherization worker from June 2010 to June 2011, I observed similarly-situated employees, after arriving back at the Brockton Warehouse, routinely securing equipment in specific areas in the warehouse (including parking the company vehicles, storing the vehicle keys and camera equipment in the office, bringing the insulation tanks into the warehouse when the weather was cold, and/or placing the two-way radios back on chargers) prior to leaving work in their own vehicles.

26. During my tenure at Advantage, after the organization of Local 7, a collective bargaining agreement set forth the hourly pay rate Advantage owed to me and my similarly-situated coworkers.

27. During my tenure at Advantage, Advantage did not have an automated time clock to track time worked by hourly employees; Advantage required hourly employees to manually complete timecards, which were maintained at the Brockton Warehouse.

28. When I worked as a weatherization worker from June 2010 to June 2011, supervisors Joe Lambalot and Brian Machado instructed me that I generally would only be paid for weatherization work at the Weatherization Job Sites, typically from 8 a.m. until 4:30 p.m. (minus a half hour for lunch). Supervisors Joe Lambalot and Brian Machado instructed me to not write additional time on my timecards.

29. When I worked as a weatherization worker from June 2010 to June 2011, I observed supervisors Joe Lambalot and Brian Machado instructing my similarly-situated coworkers that the ye generally would only be paid for weatherization work at the Weatherization Job Sites, typically from 8 a.m. until 4:30 p.m. (minus a half hour for lunch). Supervisors Joe Lambalot and Brian Machado instructed my similarly-situated coworkers to not write additional time on their timecards.

30. When I worked as a weatherization worker from June 2010 to June 2011, on a few occasions when I wrote a start time prior to 8 a.m. (to reflect my morning work at the Brockton Warehouse and travel time to the Weatherization Job Site) and/or an end time after 4:30 p.m. (to reflect my travel time back to the Brockton Warehouse and work at the Brockton Warehouse at the end of the day), Joe Lambalot changed the times I had written on the timecard and substituted 8 a.m and/or 4:30 p.m. as the daily start and end times, respectively.

31. When I worked as a weatherization worker from June 2010 to June 2011, I routinely (i) did not receive any pay for hours worked prior to 8 a.m. or after 4:30 p.m.; (ii) worked over 40 hours during a seven-day workweek; and (iii) did not receive overtime pay calculated at a rate of 150% of my regular hourly rate of pay for most periods of time I worked in excess of 40 hours during a seven-day workweek.

32. When I worked as a weatherization worker from June 2010 to June 2011, I observed that similarly-situated coworkers routinely (i) did not receive any pay for hours worked prior to 8 a.m. or after 4:30 p.m.; (ii) worked over 40 hours during a seven-day workweek; and (iii) did not receive overtime pay calculated at a rate of 150% of their regular hourly rate of pay for time they worked in excess of 40 hours during a seven-day workweek.

33. I estimate that, when I worked as a weatherization worker from June 2010 to June 2011, there were, on average, about 50 similarly-situated hourly employees working for Defendants out of the Brockton, Massachusetts location.

Sworn under penalty of perjury:

_____          _____
DEREK AMARAL                                              DATE 12-8-12

STATE OF ___MA___,
___Bristol___ COUNTY

SUBSCRIBED AND SWORN TO before me this __8th__ day of December, 2012.

_____
Notary Public
Comm. Exp.: 10-26-18

ELIZABETH CARREIRO
Notary Public
Commonwealth of Massachusetts
My Commission Expires October 26, 2018

6