UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEREK AMARAL, Individually and on behalf of all Current and Former Similarly-Situated Employees of Defendants,<br>    *Plaintiff,*<br><br>v.<br><br>ADVANTAGE WEATHERIZATION, INC. and JOHN KELLY,<br>    *Defendants* | :<br>:<br>:<br>:<br>:<br>:  C.A. NO. 1:12-CV-11583<br>:<br>:<br>:<br>: |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TO FILE AN AMENDED COMPLAINT

Pursuant to Rules 15(a)(2) and 21 of the Federal Rules of Civil Procedure, Plaintiffs Derek Amaral and similarly-situated employees move this Honorable Court for leave to file the proposed Amended Complaint in the form attached as Exhibit 1. The Amended Complaint seeks to add claims against corporate defendants owned by Defendant John Kelly and located in the very same office space as Defendant Advantage Weatherization, Inc. ("Advantage Weatherization"). The proposed Amended Complaint does not add any new theories of liability against any Defendant. All Defendants in the draft Amended Complaint are owned and operated by the same people who own and operate Advantage Weatherization and are thus already on notice of all claims in this suit.

Defendants have already admitted to violating the federal Fair Labor Standards Act and the Massachusetts wage payment and overtime pay statutes. In response to Plaintiffs' interrogatory, "state the names of the persons at Advantage involved in

creating and enforcing the compensation policies," Defendants answered, "Defendants assert their 5th Amendment right and refuse to answer." Violation of Massachusetts' overtime laws subjects companies and individuals to criminal as well as civil liability. See, e.g., Mass Gen. Laws ch. 151, § 1B (2013). Further explanation of Defendants' civil liability is below.

All of the corporate defendants Plaintiffs seek to add to this case are already intertwined with Defendant Advantage Weatherization in multiple ways. Advantage Construction, Inc. ("Advantage Construction"), often acts as a joint employer with Advantage Weatherization under federal and state wage and overtime statutes. Further, despite Defendants' unexplained delay in producing requested information about Defendants' assets, Plaintiffs are learning that Defendants split up Advantage Weatherization's assets across a confusing web of corporations and limited liability companies. Though these companies have the appearance of being separate entities, they are all, in substance, the same company: all of these companies are run by the same people, all are "headquartered" in the very same office, and all are used for the same basic business purpose. Defendants' use of the corporate form for one reason, to try to insulate its assets from the reach of this Court and Plaintiffs, which is an abuse of this state's corporation and limited liability statutes. This Court should grant Plaintiffs leave to amend their complaint to allow Plaintiffs the chance to convince this Court to disregard each such company's separate existence, to give Plaintiffs the chance to reach all of Defendants' assets if Plaintiffs can establish liability, to avoid gross injustice to Plaintiffs.

## I.  FACTS

Advantage Weatherization is a Massachusetts company specializing in weatherproofing and retrofitting existing homes and multi-family complexes with insulation.  Amended Complaint ("AC") ¶ 24.  Advantage Weatherization is based in Brockton and has performed weatherization work across the eastern half of Massachusetts since 2010.  The company is owned by Jeffrey O'Neill, Donald O'Neill, as well as Defendant John Kelly.  A copy of Advantage Weatherization's listing in the Massachusetts corporations database is attached as Exhibit 2 hereto.

Mr. Kelly managed Advantage Weatherization with Dennis DeGrazia until Mr. DeGrazia pleaded guilty to conspiracy to defraud the United States for acts he performed for his other company, U.S. Window & Door Construction Co., Inc.[1]  This Court sentenced Mr. DeGrazia to 30 days in prison.  U.S. Window & Door was a predecessor to Advantage Weatherization and was a close business partner to Advantage Weatherization after Advantage Weatherization was formed in 2010.  See Deposition of Joe Lambalot,[2] p. 189, ln. 21.

The weatherization workforce at Advantage Weatherization consists of four main types of employees: (1) salaried supervisors; (2) crew chiefs paid on an hourly basis; (3) truck drivers/loaders paid on an hourly basis; and (4) weatherization workers and laborers paid on an hourly basis.  The workers in categories 2, 3, and 4 ("hourly workers") are the subject of this suit.  Advantage Weatherization works out of its warehouse at 1120 West

---

[1]  Available at: http://www.justice.gov/usao/ma/news/2012/December/DickersonDeGraziaHebertsentencing.html

[2]  Hereinafter "Lambalot Dep.," relevant excerpts of which are attached as Exhibit A hereto.

Chestnut Street in Brockton, Massachusetts ("Advantage Warehouse"). All Advantage Weatherization vehicles and materials are stored there. At all times relevant to this suit, the two most senior salaried managers of the hourly workers reporting directly to Defendant Kelly were Joe Lambalot and Brian Machado. Mr. Machado and other Advantage Weatherization workers have their offices at the Advantage Warehouse. Deposition of Brian Machado,[3] p. 67, ln. 12. At all times relevant to this suit, Defendant Kelly ultimately made all decisions regarding the pay of employees. Deposition of Dennis DeGrazia,[4] p. 108, ln. 2-5; p. 109, ln. 7-15.

From the beginning of Advantage Weatherization's existence in 2010, Defendants routinely and consistently required all crew chiefs, all drivers/loaders, and some weatherization workers to go to the Advantage Warehouse every morning between approximately 6:30am and 7:00am, plan for the day, load trucks, travel to the job site in company trucks, and return to the warehouse at the end of the day. Defendants did not pay hourly workers any pay at all for any work performed before 8am or after workers left the job site at the end of the day, which was typically at 4:30pm.

Specifically, crew chiefs were required to report to the Brockton warehouse first thing in the morning to begin managing crews. Machado Dep, p. 57, ln. 18-21. Crew

---

[3] Hereinafter "Machado Dep.," relevant excerpts from which are attached as Exhibit B hereto. Mr. Machado was a salaried superintendent for Advantage Weatherization from the beginning of the company's existence. Superintendents are the most senior managers at Advantage Weatherization under Defendant Kelly. At Plaintiffs' deposition of Mr. Machado, he was questioned about allegations that Mr. Machado brandished a gun in the Advantage Warehouse. Machado Dep. p. 115-116. Mr. Machado's attorneys asserted his Fifth Amendment right against self-incrimination and instructed Mr. Machado not to answer questions about the incident. Id. Mr. Machado's employment with Advantage Weatherization ended abruptly soon thereafter.

[4] Hereinafter "DeGrazia Dep.," relevant excerpts of which are attached as Exhibit G hereto.

chiefs were required to arrive between approximately 6:30am and 6:45 a.m.  Declaration of Luciano Pereira ¶ 6[5]; Machado Dep., p. p. 57, ln. 18-21.  Crew chiefs would speak with a superintendent about that day's job, go over the work order for the job, and talk to his crew about the job.  Machado Dep. p. 57, ln. 22 to p. 58, ln. 18.  Crew chiefs had to ensure that trucks were loaded properly with materials and equipment prior to departure.  Deposition of Scott Wheeler,[6] p. 30, ln. 8-14; p. 33, ln. 1-12.  Crew chiefs often loaded Advantage trucks with tools and materials that the overnight warehouse worker was not able to get into the trucks on time.  Deposition of Jeremiah Pereira.[7]  Crew chiefs attempted to depart the Brockton warehouse in Advantage Weatherization vehicles early enough to ensure arrival at the job site by about 8am.  Wheeler Dep., p. 38, ln. 5-6.  It is undisputed that according to Advantage Weatherization policies and practices, crew chiefs were not paid for work prior to 8 a.m.  See Lambalot Dep., p. 104, ln. 22-24.

Drivers/loaders were also required to arrive at the Brockton warehouse first thing in the morning, by 6:45 a.m.  L. Pereira Dec. ¶ 7; Machado Dep. p. 70, ln. 1-17; p. 117, ln. 10-19.  Drivers/loaders helped load the trucks with materials and equipment required for the workday.  L. Pereira Dec. ¶ 7; Depositon of Val Fereira Dep. p. 29, ln. 10 to 15.[8]  Every crew had two trucks.  L. Pereira Dec. ¶ 21.  Each truck held three people.  Each

---

[5] Hereinafter "L. Pereira Dec.," relevant excerpts from which are attached as Exhibit C hereto.

[6] Hereinafter "Wheeler Dep.," relevant excerpts of which are attached as Exhibit D hereto. Mr. Wheeler was a crew chief at Advantage Weatherization.  Mr. Wheeler usually put his actual work start time, 6:30 a.m., on his timesheets and was terminated by Advantage Weatherization soon thereafter.

[7] Hereinafter "J. Pereira Dep."  This deposition occurred recently; the transcript has not yet been provided to the parties.

[8] Hereinafter "Fereira Dep.," relevant excerpts of which are attached as Exhibit E hereto.  This deposition was conducted recently, is not yet in final form, and is subject to revision.  Mr. Fereira has been a warehouse worker and weatherization worker for Advantage Weatherization for years.

5

truck typically carried three people to the job site, including the driver. One driver/loader would typically be scheduled to drive or would volunteer to drive. Fereira Dep. p. 7, ln. 5 to 13. Typically the two other drivers/loaders would ride in the trucks to the job site after making sure the trucks were loaded with all materials need for the day's work.[9] L. Pereira Dec. ¶ 10.

Driver/loaders would aim to arrive at the job site in time to start work at about 8 a.m. depending on the site's distance from Brockton. Sometimes, Advantage Weatherization performed work near Brockton. Often, Advantage Weatherization performed work far away from Brockton in places such as Worcester, Lowell, Cape Cod, and the far side of Boston. In light of the bad rush hour traffic typical of the greater Boston area, crews and trucks leaving for such remote locations tried to depart Brockton at about 7:00 a.m. at the latest to arrive on time.

In general, once at the job site, crew chiefs and driver/loaders started getting paid. Lambalot Dep., p. 121, ln. 12-16. Crew chiefs would supervise a team of weatherization workers and laborers. Crew chiefs, weatherization workers, and laborers would unload the trucks, set up equipment, and perform weatherization work from approximately 8 to 4:30 p.m. Often, a salaried superintendent would stop by to check on the crew's progress.

Work at the job site typically ended at about 4:30 p.m., as did the hourly workers' pay. Machado Dep. p. 56, ln. 24-25. The trucks' drivers always returned the truck to the warehouse after "punching out," usually with the same passengers who drove to the job

---

[9] It is undisputed that some weatherization workers and some laborers other than crew chiefs or drivers/loaders were not required to report to the Brockton warehouse every day and were permitted to instead commute directly to and from job sites after securing permission to do so.

6

site in the morning.  See id. p. 70, ln. 1-17.  Crew chiefs and driver/loaders almost always returned to the Brockton warehouse in the truck after "punching out."  See id. p. 48, ln. 15-17.  According to Advantage Weatherization policies and practices, crew chiefs were virtually never paid for any time after they left the job site, which was typically at 4:30 p.m.  See Lambalot Dep., p. 104, ln. 22-24.  Crew chiefs and driver/loaders sometimes returned to the Advantage Warehouse as late as 7:00 p.m.

Plaintiff Derek Amaral was one of several employees disturbed about Defendants' refusal to pay hourly workers according to federal and state law.  Mr. Amaral was one of the few who complained to management-- and to no avail.  In response, Defendants demoted Mr. Amaral, scheduling Mr. Amaral for undesirable hard labor projects requiring no skill.  L. Pereira Dec. ¶ 30.  In response to Mr. Amaral's written complaint to the U.S. Department of Labor, the Department investigated Defendants' practices, interviewed employees, and concluded that Defendants violated federal law.  A copy of the Department of Labor's report is attached as Exhibit F hereto.

Defendants never changed their pay practices.  Machado Dep., p. 86, ln. 23 to p. 87, ln. 1.  While Defendants have steadfastly maintained that drivers are not "working" when they drive their trucks to the job site, Advantage Weatherization started tracking drivers' time and paying truck drivers for the time they drive to and from job sites in September of 2013.  Fereira Dep., p. 58, ln. 11 to 25.

## II.     FACTS EVIDENCING DEFENDANTS' REFUSAL TO COOPERATE WITH CERTAIN DISCOVERY REQUESTS

Since late winter, 2013, Plaintiffs have been trying to secure information from Defendants regarding their assets.  See Affidavit of Chip Muller, Esq. ("Muller Affid.") ¶ 2, attached as Exhibit H hereto.  On March 5, 2013, Plaintiffs served interrogatories to

7

Defendants requesting financial information including the identity of all Defendants' assets over $1,000 in value.  Id. ¶ 3.  Defendants refused to provide the information, which they stated in an objection dated May 22, 2013.  Id. ¶ 4.  Similarly, on March 5, 2013, Plaintiff requested that Advantage Weatherization provide certain balance sheets, profit and loss statements, and other documentation of assets.  Plaintiffs requested that Defendant Kelly provide documentation of assets.  Both Defendants refused those requests, too, in objections filed on May 6, 2013.  Id. ¶ 5.

Pursuant to Rule 37 of the Federal Rules of Civil Procedure and this Court's local rules, Plaintiffs informed Defendants of their intention to file a motion to compel Defendants' asset information if they would not produce them voluntarily.  Id. ¶ 6.  Defendants verbally agreed to produce all the financial information Plaintiffs requested as soon as the parties could agree on a draft Protective Order for this Court to enter.  On September 11, 2013, Plaintiffs presented Defendants with their proposed edits to the Protective Order, which Defendants accepted in full—but it took Defendants until October 30, 2013, to file their motion for a protective order, which this Court entered on November 7, 2013 [Dkt. #79].  Id.

Plaintiffs made another request for Defendants' financial information to be produced on November 21, 2013.  Id. ¶ 7.  Defendants told Plaintiffs to "[r]elax" in response and promised to provide Defendants' asset and financial information to Plaintiffs the week of November 25, 2013.  Id. ¶ 8.  Defendants did not provide Plaintiffs with any such information.  On December 20, 2013, Defendants verbally promised to produce Defendants' asset information "in a few days."  Plaintiffs emailed Defendants on December 21, 2013, asking for clarification of when the information would actually be

8

produced. Defendants did not respond to Plaintiffs' email. Id. ¶ 9. Defendants refusal to timely provide responses to Plaintiffs' timely document requests and interrogatories is a violation of the Federal Rules of Civil Procedure, Rules 26, 33, and 34, which is sanctionable conduct under Rule 37.

Similarly, Plaintiffs have been trying to schedule Defendant Kelly's deposition for over a half year. Id. ¶ 10. Back on May 2, 2013, Plaintiffs sent notice that the deposition of John Kelly would occur on June 11, 2013. Mr. Kelly's deposition was postponed pending agreement on the draft Protective Order. Id. ¶ 11. After agreement on the Protective Order, on October 25, 2013, Plaintiffs emailed Defendants to request that we schedule Defendant Kelly's deposition on November 18 or 25. Defendants did not respond to that email. Id. ¶ 12. On November 15, 2013, Plaintiffs again asked Defendants to provide deposition dates. Defendants responded that "John Kelly is still looking at his schedule." Id. ¶ 13. On November 21, 2013, Plaintiffs asked for a date in December Defendant Kelly would be available for a deposition. The parties could not agree on a date in 2013. Defendants finally agreed to schedule Mr. Kelly's deposition for January 14, 2014, just two weeks before the close of fact discovery. Id. ¶ 15. Defendants' delay and recalcitrance in providing Plaintiffs with Defendants' asset information have greatly slowed and obstructed Plaintiffs' ascertainment of Defendants' assets.

### III. FACTS SUPPORTING NEW CLAIMS AGAINST CORPORATE DEFENDANTS

Through alternative means of discovery, Plaintiffs have learned that Defendants have split up Advantage Weatherization's assets in a confusing web of corporate entities in an attempt to bring its assets outside of the reach of this Court and creditors. The

9

Advantage Warehouse, for instance, at 1120 West Chestnut Street in Brockton, is used almost exclusively by Advantage Weatherization.  See Lambalot Dep. 187, ln. 20-22. Plaintiffs have learned that Advantage Warehouse is actually owned by CIP 1120 Realty, LLC, a Massachusetts company.  A copy of the deed conveying 1120 West Chestnut Street to CIP 1120 Realty is attached as Exhibit I hereto.  CIP 1120 Realty is "headquartered" in the very same office as Advantage Weatherization: 1150 West Chestnut Street, Suite 3, in Brockton, Massachusetts.  A copy of CIP 1120's record in the Massachusetts' Secretary of State's database is attached as Exhibit J hereto.  The managers of CIP 1120 Realty are Donald O'Neill, Jeffrey O'Neill, and Defendant John Kelly-- the exact same officers of Advantage Weatherization.  CIP 1120 Realty purchased Defendants' Warehouse on or about December 28, 2012, four months after this suit was filed.  See Ex. I.  Upon information and belief, CIP 1120 Realty conducts no business besides Advantage Weatherization's business.  AC ¶ 324.

Similarly, Plaintiffs have learned that Advantage Weatherization's commercial vehicles are owned by Ironclad Equipment Leasing Co. LLC, another Massachusetts company Defendant Kelly owns with Donald O'Neill and Jeffrey O'Neill, the same owners and managers of Advantage Weatherization and CIP 1120 Realty.  A copy of Ironclad's record in the Massachusetts' Secretary of State's database is attached as Exhibit K hereto.  Upon information and belief, Ironclad owns all the commercial vehicles used by Advantage Weatherization and Advantage Construction.  See list of vehicles and "Driver/Vehicle Examination Report" attached as Exhibit L hereto.  Not surprisingly, Ironclad is "headquartered" in the same office as all the other companies, 1150 West Chestnut Street, Suite 3, in Brockton, Massachusetts.  See Ex. K.

10

The third new defendant which Plaintiffs propose adding is Advantage Construction, Inc., a Massachusetts corporation "headquartered" at 1150 West Chestnut Street, Suite 3, in Brockton, the same office as Advantage Weatherization and CIP 1120 Realty.  A copy of Advantage Construction's record in the Massachusetts' Secretary of State's database is attached as <u>Exhibit M</u> hereto.  Defendant Kelly runs Advantage Construction as well as Advantage Weatherization, but did not observe their separate existence.  The two companies shared employees, equipment, vehicles, insurance policies and more.

For instance, before working for Advantage Weatherization, superintendent Joe Lambalot worked for Advantage Construction while he was directing Advantage Weatherization crews.  Lambalot Dep. p. 41, ln. 18-20.  At some point in 2010, Mr. Lambalot started being paid by Advantage Weatherization for all his time even though he still thereafter performed about half his work for Advantage Construction.  <u>Id.</u> p. 28, ln. 16-17. Mr. Lambalot does not keep track of the time he works for Advantage Construction.  <u>Id.</u>, p. 28, ln. 10-11.

Mr. Lambalot was not the only one.  According to certified payrolls provided by Advantage Weatherization, most employees for Advantage Weatherization, including Mr. Amaral and most opt-in Plaintiffs in this suit, worked on Advantage Construction jobs, as well, but were paid by Advantage Weatherization.  These employees include but are not limited to:

Jason Marcy-- Jay worked for Advantage Weatherization for about nine months and then switched to working for Advantage Construction primarily.  When working for Advantage Construction, he went to the warehouse, loaded some materials, and drove a

11

company truck to the jobsite almost every day for almost 2 years.  Mr. Marcy is due extra pay and overtime for approximately 350 days of work paid by Advantage Weatherization but controlled by both Advantage Construction and Advantage Weatherization.

Gary White -- Gary was paid by Advantage Weatherization for approximately three months.  He worked on Advantage Weatherization jobs about half the time and Advantage Construction jobs the other half.

Jeffrey Morais --  worked at Advantage Weatherization for approximately four months and was paid by Advantage Weatherization.  He actually worked for Advantage Weatherization approximately 2/3 of the time and for Advantage Construction for approximately 1/3 of the time.[10]

Plaintiffs have also learned that Advantage Construction kept Worker's Compensation insurance coverage for work performed by Advantage Weatherization workers on Advantage Weatherization jobs. AC ¶ 320.  For instance, in March, 2011, opt-in Plaintiff and Advantage Weatherization worker Jason Marcy was injured on the job.  Mr. Marcy filed a Worker's Compensation claim.  As indicated on a Worker's Compensation document, the "loss location" for Mr. Marcy's injury was "100 Veterans Way Everett, MA," the location of an Advantage Weatherization job.  A copy of a Worker's Compensation claim illustrating this is attached as Exhibit N hereto.  Mr. Marcy was paid by Advantage Weatherization for that work.  But the Worker's Compensation policy is in Advantage Construction's name.  See id.  Don Hule signed the form as a supervisors.  He worked for ACI.  See id.

---

[10] Other Plaintiffs who were Advantage Weatherization work and who worked on Advantage Construction projects under Advantage Construction's control from time to time include:  Derek Amaral, Darryll Hutchins, Thomas Worsley, Derek Carvalho, Todd Carvalho, Jeffrey Collins, Michael Santos, Jason Silva, and Markell Daise.

12

All of these companies described above are run out of the same office suite, #3 at 1150 West Chestnut Street. That building was owned by another Kelly company, Brockton 1150/CIF II, LLC ("Brockton 1150"), which plaintiffs also propose to add to this suit. A copy of Brockton 1150's record in the Massachusetts' Secretary of State's database is attached as <u>Exhibit O</u> hereto. Of course, Brockton 1150 is located at 1150 West Chestnut Street, Suite 3, as well, and is managed by Jeffrey O'Neill, Defendant Kelly's partner in his other companies. On April 2, 2013, Brockton 1150 conveyed the headquarters to MA Industrial Brockton LLC ("MA Industrial"), a Delaware company headquartered in New York, New York. The deed was signed by Jeffrey C. O'Neill. On the deed, the address of grantee MA Industrial is "c/o Condyne, LLC, 1150 West Chestnut Street, Ste. 3, Brockton . . . ." Significantly, MA Industrial paid only $10 for the large corporate building. At this stage in discovery, it is unknown whether Defendant Kelly and Messrs. O'Neill have any ownership interest in MA Industrial and whether MA Industrial performs any work besides owning the building. Whether this conveyance is valid is the subject of ongoing discovery.

The officers and owners of all the companies described above are already on notice of all the claims against Defendants in this matter because they are also the owners and principals of Advantage Weatherization. All work in the same office. The companies constitute a single enterprise and separate in name only.

### IV.   ARGUMENT

#### A. LEGAL STANDARD

Rule 21 of the Federal Rules of Civil Procedure gives this Court broad power to "add or drop a party." Fed. R. Civ. P. 21. Under Rule 21, "courts must consider judicial

13

economy and their ability to manage each particular case, as well as how the amendment would affect the use of judicial resources, the impact the amendment would have on the judicial system, and the impact the amendment would have on each of the parties already named in the action." JPMorgan Chase Bank, N.A. v. IDW Group, LLC, no. 08-cv-9116, 2009 U.S. Dist. LEXIS 39858, at *4-5 (S.D.N.Y. May 12, 2009). The "same standard of liberality" applies to amendments under Rule 21 and Rule 15. FTD Corp. v. Banker's Trust Co., 954 F. Supp. 106, 109 (S.D.N.Y. 1997) (quoting Fair Housing Dev. Fund Corp. v. Burke, 55 F.R.D. 414, 419 (E.D.N.Y. 1972)).

"Rule 15 declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." Foman v. Davis, 371 U.S. 178, 182 (1962). "[U]nder the liberal standard of Rule 15(a), leave to amend may be appropriate at any stage of litigation." Duling v. Gristede's Operating Corp., 265 F.R.D. 91, 97 (S.D.N.Y. 2010). "[T]he burden is upon the opposing party to assert and demonstrate that it will be substantially prejudiced by the proposed amendment . . . ." Pendley v. Komori Printing Machinery Co., No. 89-0420, 1990 U.S. Dist. LEXIS 1800, at *8 (D.R.I. Feb. 8, 1990).

Granting a motion for leave to add defendants is particularly appropriate when "the factual bases for adding the individually named [defendant] to the complaint became apparent during preliminary discovery." Spear v. Somers Sanitation Serv., 162 F.R.D. 1, 2 (D. Mass. 1995) (granting plaintiff's motion for leave to amend complaint to add two individual defendants, owners of defendant corporation, because amended complaint did not "add new theories of liability against the existing Defendants."); accord Perry v. Blum, 629 F.3d 1, 17 (1st Cir. 2010) (Rule 21 motion to add two parties after trial granted where new defendants had "same interests" as other defendants, new defendants

14

"testified extensively at the trial," and where new defendants had "not identified any evidence which, had they been joined earlier, they could have introduced; nor have they made any other showing of actual prejudice."). Amendments must not be futile nor prejudicial to Defendants already in the case. Spear, 162 F.R.D. at 2.

**B.   THIS COURT SHOULD ALLOW PLAINTIFFS TO ADD NEW CLAIMS AGAINST DEFENDANTS' CORPORATE AFFILIATES**

In Massachusetts, courts will disregard a company's separate existence when "an agency or similar relationship exists between the entities." My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619 (1968). An agency or similar relationship exists in two main circumstances:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

Id. Courts look to several factors to assess such an interrelationship, including

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) non- functioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985).

In Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., the District Court allowed the plaintiff to amend its complaint after the defendant declared bankruptcy. Id. at 12. The Court allowed Pepsi-Cola to add the owner of the defendant Checkers, as well as his

15

wife, and two closely held corporations owned by them, Bentley-Royce Associates, Inc. ("Bentley") and Professor Chips, Inc. ("Chips"). Id. The First Circuit affirmed the District Court's piercing of the corporate Defendant's corporate veil because "Checkers, Bentley, and Chips were under common ownership and control" and there was "[s]ufficient evidence" that "Bentley was in the soda business as well as Checkers, and it is questionable whether Chips was ever in business at all." Id. at 15. The Court found that "limiting the plaintiff's recovery to the assets of Checkers would be unjust." Id. at 17.

### 1. Ironclad, Brockton 1150/CIF II, LLC, and CIP 1120 Realty, LLC

In the instant case, Defendants Advantage Weatherization and John Kelly have split Advantage Weatherization's most significant corporate assets, its warehouse, its corporate headquarters, and its commercial trucks, across four different companies: Advantage Weatherization, Ironclad, Brockton 1150/CIF II, LLC, and CIP 1120 Realty, LLC. Upon information and belief, Ironclad, Brockton 1150/CIF II, LLC, and CIP 1120 Realty, LLC, perform no business other than holding title to Advantage Weatherization's real estate assets to keep them out of reach of Advantage Weatherization's creditors. At the time this suit was filed, Advantage Weatherization, Ironclad, Brockton 1150/CIF II, LLC, and CIP 1120 Realty, LLC, constituted a single interrelated, interdependent business enterprise with one purpose: performing weatherization services without paying its workers according to state or federal law. Defendants have still not disclosed these realities in the course of discovery and there is no overt indication on the assets themselves that they owned by a company other than Advantage Weatherization and/or Advantage Construction. The companies' "corporate identities are confused and third

parties [could not] be quite certain with what they [were] dealing." See Zimmerman v. Puccio, 613 F.3d 60, 74-75 (1st Cir. 2010) (quoting Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 574 N.E.2d 395, 400 (Mass. App. Ct. 1991), rev. denied, 410 Mass. 1104 (1991).

The proposed Amended Complaint is not futile and will not be prejudicial to Defendants. The owners and managers of all four companies are the same people, the office for all four companies is the same office, and the claims against all companies are the same as before. This Court should allow this Motion for Leave to Amend to give Plaintiffs the chance to show that Defendants are a single enterprise and that their legal separation should be disregarded by this Court to prevent gross injustice to Plaintiffs. See Checkers, Inc., 754 F.2d at 14-16.

**2. Advantage Construction, Inc.**

As for Advantage Construction, there are two main bases for this Court to allow Plaintiffs to add claims against that company. The first basis is, as with the other companies discussed above, that the company's separate corporate existence should be disregarded because Advantage Construction employees, managers, and executives have always been interchangeable with Advantage Weatherization employees. For instance, Superintendent Joe Lambalot is an Advantage Weatherization employee, works about half his week for Advantage Construction, and does not keep track of his hours for either company. AC ¶ 316. Mr. Amaral and most Collective/Class Action Members were also assigned to work on Advantage Construction projects, but were employed by and paid by Advantage Weatherization. AC ¶ 317.

Advantage Construction, Advantage Weatherization, and other companies owned by Defendant Kelly also share a common human resources department. AC ¶ 319. Advantage Weatherization employees' Workers Compensation claims for injuries suffered on Advantage Weatherization jobs were at least sometimes covered by an insurance policy held by Advantage Construction. Ex. N; AC ¶ 320.

> [T]here was a total failure to "make clear which corporation [was] taking action" or "to observe with care" the corporate form. [Defendants] did not delineate between their businesses, channeling funds between them, using employees interchangeably and applying funds from one entity to pay the bills for another.

See Zimmerman v. Puccio, 613 F.3d 60, 74-75 (1st Cir. 2010).

> In such circumstances, in imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which of them' ought to be held liable for the act of one corporation 'for which the plaintiff deserves payment."

My Bread Baking Co., 353 Mass. 614, 619 (Mass. 1968) (quoting W. W. Britton Inc. v. S. M. Hill Co., 327 Mass. 335, 338-39 (1951)).

There is a second, independent basis for granting Plaintiff's Motion for Leave to Amend to add claims against Advantage Construction, which does not require piercing any company's corporate veil: Advantage Construction was an "employer" under the Fair Labor Standards Act and Massachusetts equivalent. See Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983) ("'Employer' is defined to 'include[] any person acting directly or indirectly in the interest of an employer in relation to an employee.'") (quoting 29 U.S.C. § 203(d)) (affirming trial court's conclusion that individual defendants were personally liable under the Fair Labor Standards Act for unpaid wages because the managers "maintained offices at Maxim Industries' . . . plant and that both were actively engaged in the management, supervision and oversight of Maxim Industries' affairs,

18

including employee compensation and benefits."). John Kelly worked at 1150 West Chestnut Street on a daily basis, which is adjacent to the Advantage Warehouse in Brockton where Advantage Construction and Advantage Weatherization vehicles were based. John Kelly set the pay practices of Advantage Weatherization and Advantage Construction. See DeGrazia Dep., p. 108, ln. 2-5; p. 109, ln. 7-15. As discussed above, Advantage Weatherization and Advantage Construction employees and manager were interchangeable. It is undisputed that Joe Lambalot supervised Advantage Construction and Advantage Weatherization employees on behalf of Defendant Kelly, Advantage Weatherization, and Advantage Construction. Advantage Construction is an "employer" of the Advantage Weatherization employees for every hour they worked for Advantage Construction and is a proper defendant in this action. See Agnew, 712 F.2d at 1511. As such, the proposed Amended Complaint adding claims against Advantage Construction is not futile and should be allowed.

### C. THIS COURT SHOULD FIND NO PREJUDICE TO DEFENDANTS

When considering prejudice, this Court must consider the interests of the current Defendants, as the proposed new defendants are not yet a party to this case. This Court cannot find prejudice to any Defendant because the draft Amended Complaint does not add any new types of claims or new theories of liability against any party. All owners and managers of the new defendants are exactly the same people as own and manage Advantage Weatherization. There is nothing surprising at all about the proposed Amended Complaint. To the contrary, Defendants likely refused to timely provide its assets information to Plaintiffs to avoid Plaintiffs' discovering its confusing network of companies separately holding Advantage Weatherization's disbursed assets. Time

19

remains in discovery, though it is unlikely that the new Defendants would even need to conduct any new discovery in support of their defense. In this case, "to do equity among the parties, undue emphasis cannot fairly be placed upon strict compliance with corporate formalities." Institut Pasteur v. Cambridge Biotech Corp., 186 F.3d 1356, 1376 (Fed. Cir. 1999) (applying Massachusetts law, affirming the U.S. District Court in Massachusetts' decision to pierce the corporate veil in a patent case) (quoting Samia v. Central Oil Co. of Worcester, 339 Mass. 101, 158 N.E.2d 469, 474 (Mass. 1959)).

## V. CONCLUSION

Plaintiffs Derek Amaral and Collective Action/Class Members respectfully ask this Honorable Court to grant this Motion for Leave to File and Amended Complaint.

>     DEREK AMARAL
>     By His Attorney,
>
>     /s/ Chip Muller
>     Chip Muller, Esq. (BBO # 672100)
>     Muller Law, LLC
>     155 South Main Street, Suite 101
>     Providence, RI 02903
>     (401) 256-5171 (ph)
>     (401) 256-5178 (fax)
>     chip@chipmuller.com

Dated: December 27, 2013

## CERTIFICATION

I hereby certified that on this 27th day of December 2013, I served a true copy of this document, via this Court's CM/ECF, to:

James F. Grosso, Esq.
O'Reilly, Grosso & Gross, P.C.
1661 Worcester Road, Suite 403
Framingham, MA  01701-5400
jgrosso@ogglaw.com

>     /s/ Chip Muller