## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DEREK AMARAL, Individually and on behalf )
of all Current and Former Similarly-Situated )
Employees of Defendants, )
     Plaintiff )
      )
v. )     C.A. NO. 1:12-CV-11583-DPW
      )
ADVANTAGE WEATHERIZATION, INC. )
And JOHN KELLY, )
     Defendants. )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' ASSENTED-TO MOTION FOR
## CLASS CERTIFICATION,
## APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL,
## PRELIMINARY REVIEW OF SETTLEMENT,
## AUTHORIZATION OF DISTRIBUTION OF NOTICE, AND
## SETTING DATE FOR FINAL FAIRNESS HEARING

## I.    INTRODUCTION

Plaintiff Derek Amaral and all similarly-situated current and former employees of

Defendants submit, and Defendants Advantage Weatherization, Inc. ("AWI") and John Kelly

assent to, this Memorandum of Law in Support of Plaintiffs' Assented-To Motion for Class

Certification, Appointment of Class Representative and Class Counsel, Preliminary Review of

Settlement, Authorization of Distribution of Notice, and Setting Date for Final Fairness Hearing

pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  The parties have

reached a fair, reasonable, and adequate settlement ("Settlement"), as documented in the

Settlement and Stipulation Agreement attached as Exhibit A hereto (the "Settlement

Agreement").  The Court should grant this Motion so that the parties can distribute notice to the

proposed class members and resolve the disputed issues in accordance with the Settlement

Agreement and applicable law.

II.     **FACTUAL AND LEGAL BACKGROUND**

Defendant AWI is a Massachusetts company that specialized in construction, weatherproofing, and retrofitting insulation in existing homes and multi-family complexes from 2010 until early 2014.  During the same timeframe, AWI also contracted out employees to work on other types of construction projects, primarily for its sister corporation Advantage Construction, Inc.  Defendant John Kelly is one of the three owners and directors of AWI, and was the President of AWI until the end of 2013.  AWI has now ceased operations and its solvency is unclear.

Named Plaintiff Derek Amaral filed the complaint in this action (the "Complaint") on August 23, 2012, as a collective action under the Fair Labor Standards Act ("FLSA") and a class action under Massachusetts wage and hour laws, M.G.L. Chapter 159 §§ 148 & 150 and M.G.L. Chapter 151 §§ 1A & 1B.  The Complaint alleges that Defendants failed to pay Mr. Amaral and other similarly-situated non-exempt hourly employees regular and overtime pay for work they performed loading and unloading trucks at the company warehouse in Brockton, Massachusetts ("Warehouse") and driving or otherwise traveling between the Warehouse and job sites around Massachusetts during the work day.  Defendants' Answer denied that Mr. Amaral and other workers performed compensable work loading and unloading trucks or driving or otherwise traveling between the Warehouse and job sites.

Between August 23, 2012, and January 17, 2013, Mr. Amaral and five former AWI employees filed consent-to-join forms with the Court to opt-in to the FLSA action.  On January 17, 2013, the Court denied Defendants' motion to dismiss and granted Plaintiffs' motion for conditional certification of the collective action FLSA claims.  (Dckt. # 28).  On January 30, 2013, the Court approved the parties' joint stipulation defining the conditional class, agreeing to

the terms of the notice informing potential collective action class members of the FLSA action ("Collective Action Notice"), and setting a deadline of six months after the mailing of the Collective Action Notice for the filing of consent-to-join forms to opt in to the FLSA action.[1] (Dckt. # 33).  On February 14, 2013, Plaintiffs' counsel mailed the Collective Action Notice to approximately 173 then-current and former employees of Defendants whom Defendants identified as putative collective action class members.  Twenty-eight (28) employees responded to the notice by submitting consent-to-join forms to opt in to the FLSA action prior to the June 14, 2013 deadline.  Thereafter, between the initial June 14, 2013, deadline and February 13, 2014, an additional eleven (11) then-current or former AWI employees submitted consent-to-join forms to opt in to the FLSA action.[2]

During the course of litigation, the parties engaged in extensive discovery.  Both parties propounded Requests for Production of Documents and exchanged thousands of pages of documents.  Both parties also propounded and responded to extensive Requests for Answers to Interrogatories, including hundreds of pages of Answers to Interrogatories produced collectively by eighteen (18) Plaintiffs.  To date, Plaintiffs have conducted seven (7) depositions, including one De Bene Esse deposition, while Defendants have conducted eight (8) additional depositions. Additionally, nine (9) Plaintiffs filed declarations with the Court describing their work for Defendants.

---

[1]This definition of the Collective Action Class was approved by the Court:  Every person who is employed or ever was employed by Advantage Weatherization, Inc. for two work weeks or more as a residential weatherization laborer, weatherization worker, door and window installer, crew chief, energy installer, field employee, or other similarly-situated non-exempt employee at any time after February 1, 2010.  Dckt. # 30, Stipulation Regarding Scope of Collective Action.

[2]A number of these individuals signed declarations, four of which were filed with the Court, indicating that AWI supervisors had coerced them and other employees not to join the lawsuit earlier.  See Dckts. ## 91, 92, 98 & 99.

The discovery produced to date has revealed information supporting the parties' instant motions.  Salient facts disclosed about Defendants' pay policies and practices, Defendants' finances, and employees' work routines indicate class certification is appropriate and the settlement at issue is fair.  Key evidence includes, without limitation:

(i)     until September, 2013, all hourly field employees of AWI were subject to Defendants' policy and practice of paying them only for their work during their shift at the job site, generally 8 a.m. to 4:30 p.m. – not for travel time or alleged loading time, see Advantage Memorandum, September 17, 2010 ("Advantage Memorandum"), p. 1;[3] Deposition of Joseph Lambalot, p. 104, ln. 4 to p. 105, ln. 16 & p. 121, ln. 11-16;[4] Deposition of Brian Machado, p. 89, ln. 4-9;[5]

(ii)    all hourly field employees were supervised by both Joseph Lambalot and Brian Machado and all worked out of the Warehouse in Brockton, see Response of the Defendant AWI To Plaintiff's First Set of Interrogatories, Response to Interrogatory Nos. 13 & 16;[6] Advantage Memorandum, p. 1;

(iii)   all hourly field employees performed weatherization or other construction-related work, primarily as weatherization crew chiefs, weatherization truck drivers, weatherization workers, construction crew chiefs, or construction workers, see, e.g., Declaration of Derek Amaral, ¶¶ 6, 9, 20 & 21;[7] Declaration of Jeffrey Collins, ¶¶ 5, 8, 19 & 20;[8] Second Declaration of Luciano Periera, ¶¶ 6 & 7;[9] Declaration of Joao Rodrigues, ¶¶ 6, 13 & 14;[10] Declaration of Kevin Kennedy, ¶¶ 5, 12 & 13;[11] Answers to Interrogatories of  Casey Weaver, Answer Nos. 8(d), 9(e) & 10;[12] Answers to Interrogatories of Markell Daise, Answer Nos. 8(d) & 10;[13]

(iv)    Defendants deny that hourly field employees loaded the company trucks in the morning, stating in their answers to interrogatories that overnight warehouse workers did all of the loading, see AWI Response to Interrogatories, Response to Interrogatory Nos. 17 & 20;

---

[3]The Advantage Memorandum is attached as Exhibit B hereto.
[4]Hereinafter "Lambalot Dep.," relevant excerpts from which are attached as Exhibit C hereto.
[5]Hereinafter "Machado Dep.," relevant excerpts from which are attached as Exhibit D hereto.
[6]Hereinafter, "AWI Response To Interrogatories," relevant excerpts from which are attached as Exhibit E hereto.
[7]Hereinafter, "Amaral Decl.," which is attached as Exhibit F hereto.
[8]Hereinafter, "Collins Decl.," which is attached as Exhibit G hereto.
[9]Hereinafter, "Periera Decl.," which is attached as Exhibit H hereto.
[10]Hereinafter, "Rodrigues Decl.," which is attached as Exhibit I hereto.
[11]Hereinafter, "Kennedy Decl.," which is attached as Exhibit J hereto.
[12]Hereinafter, "Weaver Int. Ans.," relevant excerpts from which are attached as Exhibit K hereto.
[13]Hereinafter, "Daise Int. Ans.," relevant excerpts from which are attached as Exhibit L hereto.

(v)     all 29 Plaintiffs who responded to interrogatories, testified at depositions, or filed declarations ("Responding Plaintiffs"), including field employees who performed work as weatherization crew chiefs, weatherization truck drivers, weatherization workers, and construction workers, stated that (a) they were always or sometimes required to report to the Warehouse prior to their shifts in the morning; (b) when at the Warehouse in the morning, they were required to load trucks with materials, tools, and supplies for their work at the job sites; and (c) their supervisors, Joseph Lambalot and Brian Machado, were aware that they were loading and unloading trucks at the Warehouse, <u>see, e.g.</u>, Amaral Decl., ¶¶ 5, 10, & 14-17; Collins Decl., ¶¶ 4, 9, & 13-16; Pereira Decl., ¶¶ 8 & 9; Rodrigues Decl., ¶¶ 8-12, 19 & 20, Kennedy Decl., ¶¶ 7-11, 18 & 19,  Weaver Int. Ans., Answer Nos. 4, 6, 8, & 10-12; Daise Int. Ans., Answer Nos. 4, 6, 8, & 10-12;

(vi)     the two overnight warehouse workers that were deposed testified that they did not fully load the trucks and that the hourly field employees helped load materials, tools, and supplies into trucks in the mornings at the Warehouse, <u>see</u> Deposition of Valentino Feriera, p. 13, ln. 18-21, p. 15, ln. 1 to p. 16, ln. 13 & p. 19, ln. 4 to p. 20, ln. 9;[14] Deposition of Jeremiah Perreira, p. 11, ln. 3-9, p. 19, ln. 8-17 & p. 20, ln. 24 to p. 21, ln. 8;[15]

(vii)     all Responding Plaintiffs described traveling from the Warehouse to job sites after loading materials, tools, and supplies on days they reported to the Warehouse and traveling back from job sites to the Warehouse where they unloaded at least some materials, tools, and supplies, <u>see, e.g.</u>, Amaral Decl., ¶¶ 16-25; Collins Decl., ¶¶ 17-24; Pereira Decl., ¶¶ 8-9; Rodrigues Decl., ¶¶ 11-20; Kennedy Decl., ¶¶ 10-20; Weaver Int. Ans., Answer Nos. 4 & 8-10; Daise Int. Ans., Answer Nos. 4 & 8-10;

(viii)     Defendants revised their pay policy in September, 2013, to pay crew chiefs for time they spent at the Warehouse and for time truck drivers spent driving between the Warehouse and job sites; <u>see</u> Ferreira Depo., p. 64, ln 13 to p. 66, ln. 22; Rodrigues Decl., ¶¶ 15, 21 & 22, Kennedy Decl., ¶¶ 14, 20 & 21;

(ix)     Defendant Kelly was removed as President of AWI in January 2014; and

(x)     Defendant AWI ceased operations in early 2014; its solvency is unclear.

Plaintiffs' claims for nonpayment of regular and overtime wages, and Defendants' defenses against the same, depend on the application of the FLSA and Massachusetts wage and hour laws to the facts in this case.  The Massachusetts Wage Act requires employers to pay non-exempt employees in a timely manner for all time worked, MASS. GEN. LAWS ch. 149, § 148,

---

[14]Hereinafter, "Ferreira Depo.," relevant excerpts from which are attached as <u>Exhibit M</u> hereto.
[15]Hereinafter, "Pereira Depo.," relevant excerpts from which are attached as <u>Exhibit N</u> hereto.

while the FLSA and Massachusetts wage and hour laws require covered employers to pay all

non-exempt employees one and a half times their regular rate for time worked in excess of 40

hours per week, 29 U.S.C. § 207; MASS. GEN. LAWS ch. 151, § 1A.  Here, the critical legal issue

is whether alleged pre- and post-shift activities and travel time between the Warehouse and job

sites qualify as compensable work time.

Not all activities an employee performs for an employer is compensable work.  Manning

v. Boston Med. Ctr. Corp., 725 F.3d 34, 45 (1st Cir. 2013).  An employer must have actual or

constructive knowledge that an employee is performing work in order for the work to be

compensable, although work that the employer "suffers or permits," even if not requested, is

compensable.  See 29 U.S.C. § 203(g); 29 C.F.R. § 785.11; see also Manning, 725 F.3d at 44;

Ladegaard v. Hard Rock Concrete Cutters, Inc., No. 00-C-5755, 2004 U.S. Dist. LEXIS 16288,

at *13-14 (N.D. Ill. Aug. 18, 2004) (finding supervisors' knowledge that employees were

reporting to the yard to prepare and load equipment and supplies prior to travelling to the

construction job site and returning to the yard to clean up after working at the job site sufficient

to deem the work at the yard and the travel between the yard and the job site compensable even

though defendant company did not require employees to report to the yard).

With respect to pre- and post-shift work and travel time, the Portal-to-Portal Act

specifically excludes from FLSA coverage time employees spend "traveling to and from the

actual place of performance of the principal activity or activities" and "activities which are

preliminary to or postliminary to said principal activity or activities."  29 U.S.C. § 254(a).

Accordingly, the FLSA does not require employers to compensate employees for ordinary travel

between home and work or non-essential pre- and post-shift activities.  See 29 C.F.R. § 785.35

("Normal travel from home to work is not worktime."); 29 C.F.R. § 785.24 (regarding principal

activities).  However, activities that are integral and indispensable to the principal activities, even

if occurring prior to or after an employee's shift, are themselves considered principal activities,

and therefore can be compensable.  29 C.F.R. § 785.24 ("[T]he term 'principal activities'

includes all activities which are an integral part of a principal activity."); see also Chao v. Akron

Insulation & Supply , Inc., No. 5:04-CV-0443, 2005 U.S. Dist. LEXIS 9331, at *22-24 (N.D.

Ohio May 5, 2005) (preparation and ending activities performed by weatherization employees at

shop prior to and after traveling between shop and job sites, including assembling crews,

receiving assignments, and loading and unloading trucks, were "integral to the employees'

predominant activities associated with installing insulation" and thus "not excluded as

preliminary or postliminary activities under the Portal-to Portal Act"); Porcal v. Ciuffo, No. 10-

cv-40016, 2013 U.S. Dist. LEXIS 108079, at *5 (D. Mass. Aug. 1, 2013) (noting that loading,

unloading, and cleaning time at yard were integral and indispensable to construction activities).

　　　Further, the Portal-to-Portal Act exclusions do not affect the compensability of activities

occurring after the start of the first principal activity or before the end of the last principal

activity.  29 C.F.R. § 790.6 (explaining that the Portal-to-Portal Act does not affect periods

within the "workday" and that "workday … means, in general, the period between the

commencement and completion on the same workday of an employee's principal activity or

activities").  Therefore, time employees spend engaged in activities on behalf of their employer

during the workday, including travel time, is compensable work time.  See 29 C.F.R. § 785.38

("Where an employee is required to report at a meeting place to receive instructions or to

perform other work there, or to pick up and to carry tools, the travel from the designated place to

the work place is part of the day's work, and must be counted as hours worked regardless of

contract, custom, or practice."); Epps v. Arise Scaffolding & Equip., Inc., No. 2:10cv189, 2011

U.S. Dist. LEXIS 44240, at *12-15 (E.D. Va. Feb. 17, 2011) (noting that employees' reporting, loading activities, and receipt of instructions at an offsite location prior to travel to the job site could amount to an integral and indispensable part of their principal activities, and that, if so, such activities would start the employees' work day and make their travel time from the offsite location to the job site compensable time included within their workday); see also IBP v. Alvarez, 546 U.S. 21, 37 (2005) ("[D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the [Portal-to-Portal Act], and as a result is covered by the FLSA.").

Massachusetts wage and hour laws parallel federal law regarding the compensability of pre- and post-shift activities and travel time.  See Cash v. Cycle Craft Co., 508 F.3d 680, 686 (1st Cir. 2007) (noting that the fair wage and overtime provisions under both the FLSA and Massachusetts Law are "essentially identical").  The Code of Massachusetts Regulations states that "Working Time … [i]ncludes all time during which an employee is required to be on the employer's premises or to be on duty, or to be at the prescribed work site, and any time worked before or beyond the end of the normal shift to complete the work."  455 C.M.R. § 2.01.  Further, under Massachusetts law, as under the FLSA, it is clear that "[o]rdinary travel between home and work is not compensable working time," id. § 2.04(a), while time an employee spends on travel that is required or directed "after the beginning of or before the close of the work day" is compensable time, id. § 2.04(b).

With the discovery and the applicable law in mind, on February 13, 2014, Mr. Amaral and Defendants, along with their counsel, participated in a full-day private mediation with professional mediator, Maria C. Walsh, Esq., of JAMS in Boston.  After over 12 hours of

negotiation, the parties reached and signed a tentative settlement agreement, pending the Court's

approval of its terms.  On May 15, 2014, the parties entered into the Settlement Agreement

memorializing their agreement in greater detail.

The proposed Settlement is the product of two fully informed sides negotiating intensely

at arm's length.   Both sides believe that it offers a fair and reasonable resolution of the litigation

and incorporates and recognizes the substantial risks each side faced had the litigation continued,

whether through class certification of the state law claims, decertification motions related to the

FLSA claims, summary judgment motions, at trial or upon appeal, or the looming possibility of

Defendants' inability to withstand or pay any substantial judgment in Plaintiffs' favor.

**III.**     **SUMMARY OF THE TERMS OF THE SETTLEMENT**

The Settlement Agreement provides that, if approved, Defendants will pay $500,000 (the

"Settlement Fund") to resolve in their entirety the class and collective action claims as set forth

in the Complaint.  Settlement Agreement, §§ I & IV.C.1.  Under the Settlement Agreement, the

class to be certified pursuant to Rule 23 ("Rule 23 Class") is defined as:  The class of persons

who were employed by AWI for two weeks or more between February 1, 2010, and February 13,

2014 ("Covered Period") as residential weatherization laborers, weatherization workers, door

and window installers, crew chiefs, energy installers, field employees, or in other similar

positions, but excluding hourly employees employed exclusively as residential assistants, furnace

installers, and warehouse workers ("Covered Positions").[16]  Id. at §§ IV.A.15, 16 & 41; IV.B.1.

---

[16]This definition differs slightly from the initial definition of the collective action class by explicitly excluding workers employed exclusively as residential assistants, furnace installers, and warehouse workers.  The parties agreed on these changes based on information disclosed during discovery revealing that the workers in the excluded categories were not similarly-situated field employees.  Specifically, the eight residential assistants were individuals who lived at multi-family complexes where AWI performed work and acted as liaisons between AWI employees and families; they never reported to the Warehouse and did not perform weatherization or other construction work.  The four furnace installers, each of whom

Similarly, the Settlement Agreement defines collective action members as:  Every person who was employed by AWI for two weeks or more during the Covered Period in a Covered Position and who filed a consent-to-join form to opt-in to the FLSA action ("Collective Action Class Members," and together with members of the Rule 23 Class, "Class Members").  Id. at §§ IV.A.11, 15, & 16; IV.B.2.  Defendants have identified 157 current or former employees as Class Members.[17]

The Settlement Fund is designed to cover all back pay and liquidated/statutory damages available under the wage and hour laws asserted in the lawsuit, both federal and state, and to obtain a comprehensive settlement of the litigation and all claims that could be asserted concerning overtime and wage and hour claims against Defendants by the Class Members.  Id. at §§ IV.C.1 & IV.D.1-2.  The Settlement Fund is inclusive, subject to Court approval, of the following maximum fees, costs, and payments ("Other Payments"): (i) Class Counsel's fees, in an amount up to 28% of the Settlement Payment or $140,000, plus costs and expenses, in an amount up to $15,000; (ii) the costs of notice and settlement administration by a third-party administrator, in an amount up to $20,000 ("Administrative Costs"); (iii) service payments in an amount up to $18,000 to Mr. Derek Amaral ("Class Representative"); and (iv) service payments

worked for AWI for less than three weeks, also never reported to the Warehouse; instead the furnace installers went directly to the job sites to perform their work.  Additionally, the five employees who worked exclusively as warehouse workers were compensated for their time working in the warehouse loading and unloading trucks and for driving to job sites during the workday when needed to deliver materials and supplies.

[17]The number of employees identified as Class Members is slightly less than the number to whom Collective Action Notices were sent.  A handful of employees who fall within the Class Member definition were hired after the Collective Action Notices were mailed; however, this increase was more than offset because during the course of discovery the parties learned that certain hourly employees to whom Collective Action Notices were sent were not similarly-situated field employees, as noted in the previous footnote, and others did not work for Defendants for two weeks or more during the Covered Period.

of up to $250 to seven (7) Class Members who, in addition to the Class Representative, testified at depositions on behalf of all Class Members, and up to $100 to an additional eighteen (18) Class Members who responded to Defendants' extensive Requests for Answers to Interrogatories (together, the "Class Service Members").  Id. at §§ IV.C.4-7.[18]  The Settlement Fund minus the Other Payments approved by the Court ("Net Settlement Fund") will be disbursed among the Class Members who join the Settlement by timely returning properly completed Consent to Join Settlement and Release of Claims Forms ("Consenting Settlement Class Members"); there will be no reversion of any of the Settlement Funds to the Defendants.[19]  Id. at §§ IV.C.1 & 3, IV.F.3-6, & IV.G.6-8 & 10.

The Settlement Agreement endeavors to fairly allocate the Net Settlement Fund among the Consenting Settlement Class Members based on the relative damages they would likely recover were the action to proceed to trial.  Accordingly, pursuant to the Settlement Agreement, each Consenting Settlement Class Member's payment ("Individual Settlement Payment") will vary proportionately based on two factors: (i) the relative estimates of the alleged unpaid wages for each Consenting Settlement Class Member ("Unpaid Wages Estimates") and (ii) whether the Consenting Settlement Class Member opted-in to the FLSA action, and, if so, whether it was timely.  Id. at §§ IV.A.22, A.25 & E.6.  The Unpaid Wages Estimates will be calculated based on: (1) the number of weeks between the Class Member's hire date and termination date ("Weeks of Employment"), (2) the average of the Class Member's first and last hourly pay rates

---

[18]The dollar amounts cited are maximum amounts Plaintiffs' counsel will request.  With respect to costs and expenses of Plaintiffs' counsel and Administrative Costs, to the extent actual costs are less than the stated maximum amounts, Plaintiffs' counsel will seek reimbursement only for the lesser actual amounts.

[19]To the extent the Settlement Payment is not fully distributed four months after the individual settlement payments are initially mailed (for example, due to uncashed checks), any remaining funds will be donated to the Massachusetts Legal Assistance Corporation in Boston, Massachusetts.  None of any remaining Settlement Payment will revert to Defendant.  Settlement Agreement, § IV.G.10.

("Average Pay Rate"), and (3) an estimate of the number of unpaid hours each Class Member allegedly worked every week ("Weekly Unpaid Hours Estimate").  Id.at A.4, A.51, A.52 & E.6.. Each Class Member's Weekly Unpaid Hours Estimate will be a number based on the Class Member's job categorization as a weatherization crew chief, weatherization truck driver, weatherization worker, construction crew chief or construction worker.  Id. at IV.E.6.

As noted above, the Settlement Agreement anticipates that the parties will engage the services of a third-party claims administrator ("Claims Administrator") to act as claims administrator for the settlement.  Id. at § IV.E.3.  If the Court authorizes distribution of a notice of class action settlement, the Claims Administrator will mail each of the 157 Class Members a Notice of Settlement ("Notice"), a Consent to Join Settlement and Release of Claims Form ("Consent Form"), and an Election of Opt-Out of Settlement and Class Action Form ("Opt-Out Form"), in substantially the forms attached to the Settlement Agreement.  Id. at §§ IV.A.12, A.33, A.36, & F.1 & Exhibit 1 (Notice), including Form 1-A (Consent Form) & Form 1-B (Opt-Out Form).  Additionally, if the Court approves the Settlement at a Final Fairness Hearing, the Claims Administrator will thereafter distribute the Settlement Fund according to the Settlement Agreement.  Id. at § IV.G.8.

The Settlement Agreement sets forth (and the Notice and accompanying forms clearly instruct Class Members regarding) how Class Members receive payments, opt-out of the Settlement, and object to the Settlement.  Id. at §§ IV.F.3-7; Notice, p. 3-4; Consent Form; Opt-Out Form.  The documents also describe the legal consequences of each action as well as the consequences of taking no action at all.  Settlement Agreement, §§ IV.D.1-2 & F.3-8; Notice, p. 3-5; Consent Form; Opt-Out Form.  Specifically, the Settlement Agreement provides, and the Notice and the Consent Form explain, that, to receive payment, a Class Member must return the

Consent Form to the Claims Administrator within forty-five (45) days of the Claims

Administrator's mailing the Notice ("Notice Mailing Date").[20]   Settlement Agreement, § IV.F.3;

Notice, p. 1 & 3; Consent Form.  The Settlement Agreement, Notice, and Opt-Out Form also

state that Class Members can opt-out of or reject the Settlement by mailing the Opt-Out Form to

the Claims Administrator within forty-five (45) days of the Notice Mailing Date, while the

Settlement Agreement and Notice instruct that Class Members can object to the Settlement by

mailing a statement to the Court, with a copy to the Claims Administrator within the same time

frame.  Settlement Agreement, §§ IV.F.5 & 7; Notice, p. 3-4; Opt-Out Form.  The Notice also

sets forth the date, time, and location of the Final Fairness Hearing.  Notice, p. 2, 4 & 5.

      With respect to the legal consequences of taking each action, the Settlement Agreement,

Notice, Consent Form, and Opt-Out Form explain that, (i) Class Members who timely return a

proper Consent Form and become Consenting Settlement Class Members release Defendants from

federal and state law wage and hour claims arising out of their employment with Defendants in a

Covered Position during the Covered Period ("Consenting Settlement Class Member Releases");

(ii) Class Members who timely submit a valid Opt-Out Form do not release any claims;[21] and

(iii) Class Members who do nothing release their federal and state law wage and hour claims

("Non-Responding Class Member Releases") even though they will not receive an Individual

---

[20]The Settlement Agreement provides limited exceptions to the forty-five-day deadline, allowing Class Members whose initial mailing is returned to the Claims Administrator as undeliverable and Class Members whose initial Consent Form submission is deficient up to ten (10) days beyond the initial forty-five-day deadline to return proper Consent Forms.  Settlement Agreement, §§ IV.A.27, F.2 & F.4.

[21]The Settlement Agreement provides, and the Notice explains, that if a Class Member timely submits both an Opt-Out Form and a Consent Form, the Opt-Out Form will have no effect unless the Class Member specifically indicates in writing prior to the deadline for responding to the Notice that he or she no longer wishes to be a Consenting Settlement Class Member. Settlement Agreement, §IV.F.6; Notice, p. 4.

Settlement Payment.  Settlement Agreement, §§ IV.D. 1-2, F.3-8 & G.5; Notice, p. 3-4; Consent

Form; Opt-Out Form.

Additionally, the Consent Forms will be individualized for each Class Member to provide

the estimated Individual Settlement Payment the Class Member would receive assuming that all

Class Members join the Settlement and that the Court approves the proposed maximum Other

Payments.  Notice, p. 3; Consent Form, p. 1.  The Notice and Consent Form will also explain that

estimated amounts initially allocated to Class Members who do not become Consenting

Settlement Class Members will be reallocated on a pro-rata basis among the Consenting

Settlement Class Members for calculating the actual Individual Settlement Payments.  Id.

III.    **RELIEF SOUGHT**

In order to obtain the most effective resolution of all the federal and state wage and hour

claims, the Settlement encompasses FLSA claims and Massachusetts state law claims.  The

parties submit that the differences in the substantive elements of the claims between the federal

and state law claims are not material for purposes of settlement.  Here, the primary legal

question for recovery of wages under both the FLSA and Massachusetts state law is whether the

time hourly field employees allegedly spent loading or unloading trucks with materials and

supplies at the Warehouse and traveling between the Warehouse and job sites was compensable

work time requested, suffered or permitted by Defendants or was non-compensable time

employees spent engaging in preliminary or postliminary activities and travel.  Similar principles

are used under both the federal and state laws to analyze and answer this question.  See Cash v.

Cycle Craft Co., 508 F.3d 680, 686 (1st Cir. 2007) (noting that the fair wage and overtime

provisions under both the FLSA and Massachusetts Law are "nearly identical").

In order to effectuate the Settlement, the parties move for the Court to certify the Rule 23

Class for settlement purposes only, appoint the Class Representative and Class Counsel,

preliminarily review the Settlement Agreement, authorize the distribution of the notice of

settlement, and set a date for the final fairness hearing.  Finally, the parties propose that the Court

adopt the schedule set forth below.

| *Event* | *Timing* |
|---|---|
| 1. Mailing of Notices | Between seven (7) and fourteen (14) days after the Court's Order authorizing distribution of Notice of Settlement (or as soon thereafter as practicable) |
| 2. Deadline for filing Objections and submitting Election to Opt-Out of the Settlement Forms | Forty-five (45) days after the date of mailing of Notice of Settlement |
| 3. Deadline for Submitting Consent to Join Settlement and Release of Claims Forms | Forty-five (45) days after the date of mailing of Notice of Settlement |
| 4. Final Fairness Hearing | Approximately three (3) months after Authorization of Distribution of Notice of Settlement[22] |

## IV.   **LEGAL ARGUMENT**

"Compromises of disputed claims are favored by the courts."  Williams v. First Nat'l

Bank, 216 U.S. 582, 595 (1910); see also Durett v. Housing Auth. of Providence, 896 F.2d 600,

604 (1st Cir. 1990).  Settlement spares the litigants the uncertainty, delay and expense of a trial,

while simultaneously reducing the burden on judicial resources.  Rule 23(e) provides that any

settlement of a class action must be approved by the Court.  Fed. R. Civ. P. 23(e).  However,

prior to preliminarily determining whether the settlement is fair, the Court must determine

---

[22]After a date is set for the hearing regarding the motions discussed herein, counsel for the parties will confer with the Court's clerk and determine a specific date to suggest for the Final Fairness Hearing, assuming the Court approves the motions at the hearing.

whether to certify the Rule 23 Class for settlement purposes.  See Hochstadt v. Boston Sci.

Corp., 708 F. Supp. 2d 95, 101 (D. Mass. 2010).

On January 18, 2013, the Court granted conditional certification of the collective action

class based on declarations of Mr. Amaral and five similarly-situated co-workers, a statement of

Defendants' policy indicating that hourly field workers were to be paid only for work at the job

site, and a report drafted by the Department of Labor investigator who determined Defendants'

pay practices violated the FLSA.  See Memorandum of Law in Support of Plaintiff's Motion

for Conditional Certification ("Conditional Certification Memorandum"), Exhibits A-G (Dckt.

# 22).  As discussed herein, the discovery conducted during the year since the Court

conditionally certified the collective action has revealed even more evidence supporting the

parties' current motion for certification of the Rule 23 Class for settlement purposes under the

stricter Rule 23 class certification standard.

### A.   CERTIFICATION OF RULE 23 CLASS FOR SETTLEMENT PURPOSES IS APPROPRIATE

The Supreme Court recognizes that the benefits of a proposed class action settlement

can only be realized through the certification of a settlement class.  See Amchem Prods. v.

Windsor, 521 U.S. 591 (1997).  In Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st

Cir. 2003), the First Circuit instructed that a rigorous analysis of the Rule 23 requirements must

be conducted where the parties seek certification of a class for settlement purposes.  However,

"[t]his cautionary approach notwithstanding, the law favors class action settlements."

Hochstadt, 708 F. Supp. at 102 (quoting In re Lupron Mktg. and Sales Practices Litig., 228

F.R.D. 75, 88 (D. Mass. 2005)).

In order for a lawsuit to be maintained as a class action under Rule 23, a named plaintiff must establish each of the four threshold requirements of subsection (a) of the Rule plus the requirements of one of the categories of subsection (b).  Specifically, Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R Civ. P. 23(a).  Additionally, under 23(b)(3) a class action may be maintained if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

Here, as detailed below, the parties submit that the elements of Rule 23(a) and 23(b)(3) are met with respect to the proposed settlement class, and, therefore, class certification is warranted.

### 1.    Numerosity Under Rule 23(a)(1)

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  While no specific number of class members is required to maintain a class action, a class of more than 40 people generally satisfies the numerosity requirement.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).  Numerosity is satisfied here, where there are 157 Class Members who fall within the proposed definition of the Rule 23 Class.

### 2.    Commonality Under Rule 23(a)(2)

"The threshold for commonality under Rule 23(a)(2) is not high. … Because the Rule 23(a)(2) analysis is '[a]imed in part at determining whether there is a need for combined

17

treatment and a benefit to be derived therefrom, the rule requires only that resolution of the common questions affect all or a substantial number of the class members.'" In re M3 Power Razor Sys. Mktg. & Sales Practice Litig., 270 F.R.D. 45, 54 (D. Mass. 2010) (quoting Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986)).  Further, "[w]hile at least one common issue of fact or law at the core of the action must shape the class, Rule 23(a) does not require that every class member share every factual and legal predicate of the action." In re Lupron, 228 F.R.D. at 88.

Commonality is met here for purposes of settlement.  As described in the Conditional Certification Memorandum and further established through discovery, the members of the proposed Rule 23 Class ("Rule 23 Class Members") were all paid on an hourly basis and, until September 2013, when Defendants started paying crew chiefs and drivers for certain work before and after their job site shifts, Defendants followed a policy of not paying Rule 23 Class Members before or after their shifts at the job sites.  See Advantage Memorandum, p.1; Lambalot Depo., p. 104, ln. 23 to p. 105, ln. 16 & p. 121, ln. 15-16; Machado Depo., p. 90, ln. 7-9; Ferreira Depo., p. 64, ln. 13 to p. 66, ln. 22.  Additionally, all Rule 23 Class Members worked out of the Defendants' Brockton Warehouse under the same two supervisors, and all Rule 23 Class Members performed construction-related jobs.  See AWI Response to Interrogatories, Response to Interrogatory Nos. 13 & 16; Advantage Memorandum, p.1.  Further, in their answers to interrogatories, Defendants state that only overnight warehouse workers loaded and unloaded company trucks.  See AWI Response to Interrogatories, Response to Interrogatory Nos. 15 & 17.  However, statements from almost thirty (30) Plaintiffs as well as two AWI overnight warehouse workers indicate that Rule 23 Class Members loaded trucks with materials, tools, and supplies at the Warehouse and then traveled to job sites in the morning and unloaded

some materials, tools, and supplies after traveling back from job sites to the Warehouse in the afternoon.[23] See, e.g., Feriera Depo., p. 13, ln. 18-21, p. 15, ln. 1 to p. 16, ln. 13 & p. 19, ln. 4 to p. 20, ln. 9; Perreira Depo., p. 11, ln. 3-9, p. 19, ln. 8-17 & p. 20, ln. 24 to p. 21, ln. 8; Amaral Decl., ¶¶ 18-25; Collins Decl., ¶¶ 17-24; Pereira Decl., ¶¶ 8-9; Rodrigues Decl., ¶¶ 11-20; Kennedy Decl., ¶¶ 10-20; Weaver Int. Ans., Answer Nos. 4 & 8-10; Daise Int. Ans., Answer Nos. 4 & 8-10.

The core issue on which the wage claims in this case are based – whether Rule 23 Class Members performed compensable pre- and post-shift work for which Defendants did not pay them – raises common questions of both fact and law, the answers to which would resolve critical issues for the entire class in one stroke.  Key questions with class-wide implications include, without limitation:

(i) Did, as Defendants' interrogatory responses indicate, the overnight warehouse workers fully load and unload the company trucks rendering it unnecessary for any Rule 23 Class Member to load or unload the trucks?

(ii) Did, as reported by almost thirty (30) Rule 23 Class Members, the supervisors require all Rule 23 Class Members to load trucks when they reported to the Warehouse in the morning and unloaded trucks when they returned in the afternoon?

(iii) Were the two supervisors aware that the Rule 23 Class Members were loading and unloading company trucks at the Warehouse during time for which they were not compensated?

(iv) Was the loading of materials, tools, and supplies at the Warehouse by Rule 23 Class members integral and indispensable to the work the Rule 23 Class Members performed at the job sites, and thus a principal, compensable activity?

---

[23]The Plaintiffs' statements also indicate that there was some variation in the particular type of construction work the proposed Rule 23 Class Members performed at the job sites and in the number of days per week they generally reported to the Warehouse, primarily related to their job category as crew chief, weatherization truck driver, weatherization worker, construction crew chief, or construction worker. However, such variation does not undermine the similarity of the loading work the proposed Rule 23 Class Members state they performed when at the Warehouse.  See, e.g., Amaral Decl., ¶¶ 6, 16-17 & 24-25; Collins Decl., ¶¶ 5, 15-16, 23-24; Pereira Decl., ¶¶ 6-9; Rodrigues Decl., ¶¶ 6, 11 & 12; Kennedy Decl., ¶¶ 5, 10 & 11;  Weaver Int. Ans., Answer Nos. 8 & 10; Daise Int. Ans., Answer Nos. 8 & 10.

> (v) Was the loading of materials, tools, and supplies a principal activity that commenced the work day, making the travel time from the Warehouse to the job site after such loading compensable time?

As the answers to each of these questions will resolve critical issues regarding the claims of all Class Members, there are clear benefits of combined treatment of the class.

Further, to the extent that differences existed among the class members regarding the number of days per week they reported to the Warehouse, such differences relate to the amount of damages each class member would receive.  It is clear that commonality can be found despite differences in damages among putative class members.  See Martins v. 3PD, Inc., C.A. No. 11-11313, 2013 U.S. Dist. LEXIS 45753, at *17-18 (D. Mass. Mar. 28, 2013).  The element of commonality is met here.

### 3.     Typicality Under Rule 23(a)(3)

Rule 23(a)(3) requires that a representative plaintiff's claims be "typical" of those of other class members, although the rule does not require that the representative plaintiff's claims are identical of absent class members.  See In re Credit Suisse – AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008).  Rule 23(a)(3)'s typicality requirement is satisfied where the class representative's claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of all other class members.  Martins, 2013 U.S. Dist. LEXIS 45753, at *19 (quoting In re Relafen Antitrust Litig., 231 F.R.D. 52, 69 (D. Mass. 2005)).  The commonality and typicality requirements of Rule 23(a) "tend to merge."  Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982); see also In re Credit Suisse, 253 F.R.D. at 23.  The goal underlying the typicality analysis is to ensure that "the interests of the class and the class representatives [are such] that the latter will work to benefit the entire class through

the pursuit of their own goals."  In re TJX Cos. Retail Sec. Breach Litig., 246 F.R.D. 389, 393

(D. Mass. 2007).

Here, Derek Amaral's claims, like the claims of the other Class Members, arise from

Defendants' failure to pay hourly employees for time they spent at the Warehouse allegedly

loading and unloading company trucks and traveling between the Warehouse and job sites.  As

his claims arise from the same pattern of events and under the same legal theories as the claims

of the proposed class, the appointment of Derek Amaral as the representative party would

satisfy the typicality requirement.

### 4.  Adequacy Under Rule 23(a)(4)

The final requirement of Rule 23(a) requires that "the representative parties will fairly

and adequately protect the interests of the class."  "The moving party must show first that the

interests of the representative party will not conflict with the interests of any of the class

members, and second, that counsel chosen by the representative party is qualified, experienced

and able to vigorously conduct the proposed litigation."  Andrews v. Bechtel Power Corp., 780

F.2d 124, 130 (1st Cir. 1985).

With respect to potential conflicts of the representative party, courts look to factors

similar to those that support typicality.  Specifically, courts have found that, when a named

plaintiff's claims arise out of the same fact pattern and are based on the same legal theories as

those of the proposed class members, the named plaintiff's interests do not conflict with the

interests of other class members.  See, e.g., Hochstadt, 708 F. Supp.2d at 103 ("For essentially

the same reasons that [the Named Plaintiff's] claims are 'typical' of the claims of the Settlement

Class," the Court should "find that, for purposes of the settlement, [Named Plaintiff's] interests

do not conflict with the interests of other class members").  Here, where Mr. Amaral's claims,

like those of the proposed class, are based on claims that Defendants failed to pay him for pre- and post-shift compensable work he performed, Mr. Amaral's interests are aligned with, not in conflict with, those of the proposed class members.[24]

Adequacy is also met here with regard to Class Counsel's qualifications.  Attorney Muller has been practicing law for over seven (7) years, and has been the principal of his own law firm since 2009.  Declaration of Chip Muller, ¶ 3.[25]  He has worked in the field of employment law since he started practicing law and has considerable experience representing employees in suits against their employers.  Id. at ¶ 4.  Mr. Muller also has experience as both class counsel and defense counsel in other class and collective action wage and hour suits.  Id. at ¶ 5.  Attorney Muller has obtained favorable results for his clients, at both trial and through settlement.  Id. at ¶ 6.   In addition to his work representing clients, Mr. Muller has authored

---

[24] The First Circuit has also considered the willingness of the class representative to prosecute the case. See In re TJX Cos. Retail Sec. Breach Litig., 246 F.R.D. at 394 ("[T]he First Circuit utilizes an independent two-part inquiry to determine if a class representative is adequate, asking (1) whether there is a potential for conflict and (2) whether there is an assurance of vigorous prosecution of the action.").   To the extent the Court finds such inquiry relevant here, there is no doubt that Mr. Amaral has been actively involved in prosecuting this action to date and intends to continue such involvement through the resolution of the case.  See Affidavit of Derek Amaral, attached as Exhibit O hereto, ¶ 5.  Mr. Amaral has spent hundreds of hours on this action, vigorously pursuing the rights of the class since 2011 when he first passed out fliers to his co-workers urging them to take action to secure payment for time they spent working prior to and after their shifts at the job sites.  Mr. Amaral performed actions on behalf of  the class, including, without limitation, filing a wage and hour complaint, meeting with the Massachusetts Attorney General, meeting with Department of Labor representatives in person, as well as via telephone and email, interviewing attorneys to represent him and the class, assisting in the drafting of a very detailed complaint, contacting co-workers to inform them about the lawsuit and obtaining declarations in support of the motion for conditional certification, meeting with attorney Muller and his assistants to discuss facts and strategy of the case, reviewing all court filings by both plaintiffs and defendants, testifying at a deposition, responding to requests for documents, attending depositions of Brian Machado, Joseph Lambalot, and defendant John Kelly, attending the court hearing on the motion to amend the Complaint, and attending the mediation session for more than twelve (12) hours.  See id., ¶¶ 6 & 7.   Mr. Amaral's actions make it clear that he is an adequate class representative who has been and will continue to be a strong advocate for the proposed class.

[25] The Declaration of Attorney Chip Muller ("Muller Decl.") is attached as Exhibit P hereto.

articles, given presentations, and taught continuing legal education classes on various topics related to employment law.  Id. at ¶ 7.

Additionally, Attorney Muller has vigorously pursued this case to date, as indicated in part by: (i) the thorough Complaint he filed on behalf of the Plaintiffs, (ii) his successful advocacy for both the denial of Defendants' motion to dismiss and the grant of Plaintiffs' motion for conditional certification of the FLSA action, (iii) the extensive discovery in which he has engaged, and (iv) his negotiating with Defendants for a tentative settlement agreement on behalf of the Plaintiffs despite the cessation of AWI operations.

Accordingly, the parties urge that the proposed class representative and class counsel meet the Rule 23(a)(4) adequacy standards.

### 5.    The Requirements of Rule 23(b)(3) Are Met for Settlement Purposes

The proposed Rule 23 Class also meets the requirements of Rule 23(b)(3) for purposes of settlement.  Under 23(b)(3) a class action may be maintained if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

### a.    Predominance

The predominance inquiry is similar to, but more demanding than, the Rule 23(a)(2) commonality requirement.  See In re M3 Power Razor, 270 F.R.D. at 55.  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Id. at 55-56 (quoting Amchem, 521 U.S. at 623).  Rule 23(b)(3) does not require that all questions of law or fact be common.  See id. at 56.  Further, courts often focus on the commonality of liability issues and "generally find the predominance

requirement to be satisfied even if individual damages issues remain." Smilow, 323 F.3d at 40; see also Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 272-273 (D. Mass. 2005). Predominance can be found despite variation in damages among plaintiffs, particularly where either (i) the damage calculation is not so complex as to become a "Herculean task" or (ii) even if the damage calculation is complex, injury is capable of proof common to the class and damages from the injury are measurable on a class-wide basis. See Martins, 2013 U.S. Dist. LEXIS 45753, at *22-23 n.3 (discussing impact of Comcast v. Behrend, 133 S.Ct. 1426 (2013)). "The important factors in [the predominance] inquiry are efficiency and judicial economy." Id. at *23.

As alluded to above in discussing Rule 23(a)(2) commonality, common questions of law and fact predominate in this action. As set out above in greater detail, common questions include whether Rule 23 Class Members or only warehouse workers loaded trucks, and, if Rule 23 Class Members loaded trucks, whether such activity was known to supervisors and was integral and indispensable to the work Rule 23 Class Members performed at job sites, commencing the working day of the Rule 23 Class Members. Similar common questions of law and fact have been deemed sufficient to present a common predominance of issues in cases involving pre- and post-shift work. See, e.g., Arredondo v. Delano Farms Co., 1:09-cv-01247, 2014 U.S. Dist. LEXIS 22658, at *106 (E.D. Cal. Feb. 21, 2014) (with respect to a subclass of agricultural workers alleging violations for failure to pay them for pre-shift work, "the Court again finds from the evidence that there is a common question as to whether uncompensated work was performed and that resolution of this common question adversely to Defendants may be the basis for potential liability"); c.f., Ladegaard, 2004 U.S. Dist. LEXIS 16288, at *4 n.1 (proceeding as a class and collective action against employer for failing to pay wages and

overtime for time employees spent loading and unloading trucks and driving between the yard and the work site).  Further, for the purposes of settlement, the parties agree that individual variations in the magnitude of damage suffered by individual class members should not affect predominance, as the damages calculation is not particularly complex, the Rule 23 Class Members have suffered the same type of damages based on the same liability theories, seek the same type of relief, and utilize a single model for measuring damages.

Accordingly, the parties contend that issues regarding Defendant's failure to pay Rule 23 Class Members for regular and overtime hours they allegedly worked present common questions of law and fact which predominate over any factual variations in the calculation of individual damages.

### b. Superiority

Finally, resolution of this litigation by class settlement is more efficient and thus superior to the individual adjudication of Rule 23 Class Members' claims.  This Settlement could resolve the claims of 157 Class Members in a single, consolidated proceeding, obviating the need for multiple trials, particularly where there may be little or no interest for each Rule 23 Class Member to proceed with his or her own case.  Class certification would "achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness."  In re M3 Power Razor, 270 F.R.D. at 56 (quoting Amchem, 521 U.S. at 615).   Further, the Settlement provides the Rule 23 Class Members with an ability to obtain prompt, predictable and certain relief, whereas individualized litigation carries with it great uncertainty, risk and costs, and provides no guarantee that any Rule 23 Class Member will obtain relief at the conclusion of the litigation process.

For all of these reasons, for purposes of the settlement posture in which the case now stands, the Rule 23 Class is appropriate and should be certified for purposes of settlement.

### B.   PRELIMINARY REVIEW OF THE SETTLEMENT AGREEMENT REVEALS THAT IT IS FAIR, REASONABLE, AND ADEQUATE

As noted above, Rule 23(e) provides that any settlement of a class action must be approved by the Court.  Fed. R. Civ. P. 23(e).  The ultimate determination whether a proposed class action settlement warrants approval resides in the Court's discretion.  Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968).  As discussed below, the terms of this Settlement Agreement are well within the range of fair, reasonable, and adequate and should be deemed sufficient to warrant public notice and a hearing.

### 1.   The Standards and Procedures for Preliminary Review

Rule 23(e) provides the mechanism for settling a class action, including, as here, through a class certified for settlement purposes.  Fed. R. Civ. P. 23(e); Amchem, 521 U.S. at 617.  The Court's approval of a settlement agreement pursuant to Rule 23(e) involves a two-step process.  At the first step, the Court reviews the terms of the agreement to determine if they are sufficient to warrant public notice and hearing.  At the second step, the Court determines whether or not to grant approval.  See MANUAL FOR COMPLEX LITIGATION, FOURTH, § 13.14, at 173 (2013) ("MANUAL FOURTH"); see also Hochstadt, 708 F. Supp. 2d at 97 n.1.  In determining whether the settlement agreement is sufficient to warrant public notice and a hearing, the primary issue before the Court is whether the terms of the proposed settlement are within the range of what might be found fair, reasonable and adequate.  See MANUAL FOURTH, § 21.632, at 321; see also In re M3 Power Razor, 270 F.R.D. at 52.

### 2. There is a Strong Basis to Find that the Settlement is Within the Range of Fair, Reasonable and Adequate

Courts typically apply the following four-factor test to review the preliminary fairness of a class action settlement:

(1) the negotiations occurred at arm's length;
(2) there was sufficient discovery;
(3) the proponents of the settlement are experienced in similar litigation; and
(4) only a small fraction of the class objected.[26]

Hochstadt, 708 F. Supp. 2d at 107 (quoting In re Lupron Mktg. and Sales Practices Litig., 345 F. Supp. 2d 135, 137 (D. Mass. 2004)).  All relevant tests are satisfied here.

First, the Parties' settlement negotiations occurred at JAMS, a well-known mediation center, under the direction and guidance of Attorney Maria Walsh, a former administrative law judge and experienced mediator.  The Parties negotiated for over twelve hours in an effort to reach a settlement.  The circumstances of such arm's length negotiations "are persuasive indicators that the [Settlement] was not the result of collusion but rather the result of negotiations conducted at arm's length."  Id.

The second and third factors are likewise satisfied.  As indicated above, the Parties have engaged in extensive discovery.  They exchanged thousands of pages of documents and responded to hundreds of interrogatories.  Additionally, to date, Plaintiffs have conducted seven (7) depositions, including one De Bene Esse deposition, while Defendants have conducted another eight (8) depositions.  As part of the discovery process, the Parties exchanged information regarding the employees in Covered Positions, including their employment histories, work weeks, and payroll data.  Class Counsel provided Defendants with estimates as to time

---

[26]The fourth factor is not applicable until notice has been provided and Class Members have had an opportunity to raise any objections to this Settlement.

worked and descriptions of job duties for over thirty (30) Plaintiffs while Defendants produced

information including time cards, registered payrolls, and certified payrolls for hourly employees

as well as financial data reflecting the assets and liabilities of each Defendant.  The parties

similarly exchanged assessments of the legal merits of the claims and Defendants' defenses,

including assessment of the likelihood of Plaintiffs' ability to pursue the claims on a collective or

class basis and the risks associated with denial of the same and/or decertification.

Moreover, as detailed above, Class Counsel has experience and success in pursuing and

settling employment-related claims.  Attorney Muller has been involved in several federal and

state wage and hour claims, he is well versed in the issues and how to evaluate the claims

negotiated in this Settlement on behalf of Plaintiffs.  See Muller Decl., ¶ 5.  Defendants are also

represented by experienced counsel.  Attorney James F. Grosso has been practicing labor and

employment law in state and federal courts since 1975.  He has counseled and defended

hundreds of employers in resolving wage and hour issues.  See Affidavit of James F. Grosso, ¶¶

1-9.[27]  Additionally, Attorney Miranda S. Jones has been practicing law since 1990.  From 2007

– 2013, she served as an Assistant Attorney General in the Massachusetts' Attorney General's

Office's Fair Labor Division.  During her six year tenure, she obtained millions of dollars in

restitution and fines through both civil and criminal wage and hour enforcement actions against

hundreds of employers.  Since June of 2013 she has represented multiple employers accused of

wage and hour violations.  See Affidavit of Miranda S. Jones, ¶¶ 1-9.[28]

Counsel further negotiated to ensure the Settlement meets all the requirements of the

FLSA collective action provisions and the class action provisions of Rule 23, and, as discussed

---

[27]The affidavit of Attorney James F. Grosso is attached as Exhibit Q hereto.
[28]The affidavit of Attorney Miranda S. Jones is attached as Exhibit R hereto.

below, specifically provides administrative procedures and allocation to assure all Class

Members' fair recoveries and equal and sufficient due process rights.  In short, the settlement

proponents are experienced in similar litigation, and their professional judgment should be

entitled to significant weight.  See Hochstadt, 708 F. Supp. 2d at 108; see also Fisher Bros. v.

Phelps Dodge Indus., 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("The professional judgment of

counsel involved in the litigation is entitled to significant weight.").

 In addition, both the amount and allocation of the Settlement Fund are within the range

of fair, reasonable, and adequate under the circumstances of this case. See Hochstadt, 708 F.

Supp. 2d at 109 ("As with the settlement itself, 'the plan of allocation must be fair, reasonable,

and adequate.'") (quoting In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 262 (D.

N.H. 2007)).  The amount of the Settlement Fund, although less than the amount Plaintiffs'

estimate they are owed, is a reasonable compromise of disputed issues.  The compromise is

particularly reasonable in light of the inherent risks of continued litigation; the possibility of

denial of class or collective treatment; and the substantial concern that, even if damages were

awarded to Plaintiffs after a trial, the Defendants, who are no longer operating the business,

would not have the resources to pay such awards.

The proposed allocation of the Settlement Fund is also within the range of fair,

reasonable, and adequate.  First, as will be discussed in detail in motions to be filed with the

Court in the future, the proposed maximum Attorneys' Fees and costs, Administrative Fees, and

Service Payments are at least proportional to the time and effort expended on this action and are

all within the range generally allowed by the First Circuit.  See, e.g., In re Thirteen Appeals

Arising out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 300 (1st Cir. 1995)

(attorneys' fees equal to over 30% of the settlement fund); Scovil v. FedEx Ground Package

Sys., No. 1:10-CV-5-15, 2014 U.S. Dist. LEXIS 33361, at *20-32 (D. Me. Mar. 14, 2014)

(approving attorneys' fees and expenses equaling one-third of the settlement fund and service

awards ranging between $10,000 and  $20,000, for a total of $130,000, for nine named

plaintiffs).  Second, the allocation among Consenting Settlement Class Members is also fair,

striving to allocate the Net Settlement Fund to reflect the relative damages awards Consenting

Settlement Class Members would likely receive if the case were to proceed to trial.  C.f.

Hochstadt, 708 F. Supp. 2d at 110 (finding revised plan of allocation fair, reasonable, and

adequate for purposes of preliminary review, in part based on plan's utilization of discrete

disclosure events to approximate the damages each class member actually suffered).  As

described above, the allocation utilizes two primary factors: (i) Unpaid Wages Estimates for each

Consenting Settlement Class Member and (ii) whether each Consenting Settlement Class

Member opted-in to the FLSA action, and, if so, whether it was timely.  The Unpaid Wages

Estimates calculation is a multiple of the number of weeks the Class Member worked for AWI,

the Class Member's Average Pay Rate, and an estimate of the number of hours the Class

Member allegedly worked without pay.  The unpaid hours estimate is based on the Class

Member's work as a weatherization crew chief, weatherization truck driver, weatherization

worker, construction crew chief, or construction worker.  The first factor of the allocation

formula reflects the differences in damages allegedly owed to different Class Members based on

evidence regarding variations in the length of employment, pay rates, and average unpaid hours

allegedly worked each week by Class Members.  The second factor accounts for the Class

Members' varying risks of maintaining collective action or class action certification based on

their opt-in statuses.

As the Settlement Agreement resulted from arm's-length negotiations, conducted by experienced counsel for all parties, after more than sufficient discovery, and the Settlement Fund amount and allocation are within the range of fair, reasonable, and adequate under the circumstances of this case, the standards for authorizing notice and a hearing with respect to the Settlement Agreement are met in this case.

**C.      THE PROPOSED NOTICE PROVIDES ADEQUATE NOTICE TO CLASS MEMBERS**

Under Rule 23(c)(2)(B) and Rule 23(e), class members are entitled to adequate notice of class certification and any proposed settlement.  "If a class is certified and settled simultaneously, a single notice is generally used."  MANUAL FOURTH, § 21.311, at 289.  Such notice must be distributed in the best practicable manner and must provide clear, concise, accurate information to allow class members to decide how to proceed.  Fed. R. Civ. P. 23(c)(2)(B) & 23(e).

**1.      The Notice Satisfies Rule 23 and Due Process**

The Parties here propose using the services and expertise of a professional claims administrator to disseminate the Notices.  Pursuant to the terms of the Settlement Agreement, the Claims Administrator will send, by first class mail, to each Class Member, the Notice, along with a Consent Form and an Opt-Out Form.  Settlement Agreement, §IV.F.1.  The Claims Administrator will take all reasonable steps to trace the addresses of  anyone for whom a Notice is returned by the post office as undeliverable, including tracking of all undelivered mail, performing additional address searches, and re-mailing where new addresses are found.  Id. at § IV.F.2.  Contact information for Class Counsel and the Claims Administrator will be provided on the Notice and the forms for recipients who have questions and/or require new copies of the Notice or the accompanying forms.  Notice, p. 3 & 5; Consent Form; Opt-Out Form.  This

31

notice plan is consistent with – if not more robust than – class certification notice plans approved by numerous state and federal courts, and is the best notice practicable under the circumstances of this case, as required by Rule 23.  Fed. R. Civ. P. 23(c)(2)(B); see also MANUAL FOURTH, §§ 21.311-12 (describing class certification notice and settlement notice requirements).

**2.     The Proposed Class Notices Are Accurate, Informative and Easy to Understand**

Additionally, the proposed Notice and accompanying forms provide the required clear, concise, and accurate information.  Specifically, the documents set forth information regarding the nature and principal terms of the Settlement Agreement, including the total value of the Settlement Fund; the maximum payouts of the Settlement Fund to Class Counsel, the Claims Administrator, and Class Service Members;[29] the allocation of the Net Settlement Fund among Consenting Settlement Class Members; estimates of each Class Member's Settlement Payment assuming all Class Members participate in the Settlement and the maximum Other Payments are approved by the Court; the procedures and deadlines for consenting to join the settlement, opting out, and submitting objections; the consequences of taking or foregoing the various options; and the date, time and place of the final settlement approval hearing.  See Fed. R. Civ. P. 23(c)(2)(B) & 23(e) (setting forth notice requirements); MANUAL FOURTH, §§ 21.311-312 (describing notice requirements).  Accordingly, the Notice complies with the standards of fairness, completeness, and neutrality required of a settlement class notice disseminated under authority of the Court.  See 4 NEWBERG ON CLASS ACTIONS (Fourth) §§ 8.21, 8.39; MANUAL FOURTH, §§ 21.311-21.312.

---

[29]The information regarding the maximum amount of attorneys' fees and costs that may be sought by Plaintiffs and Class Counsel also satisfies the requirements for notice of attorney's fees and nontaxable costs required by Rule 23(h)(1).  See Fed. R. Civ. P. 23(h)(1).

### D.        A FINAL FAIRNESS HEARING SHOULD BE SCHEDULED

The Court should schedule a final approval hearing to determine that final approval of the Settlement is proper.  The final fairness hearing will provide a forum to explain, describe or challenge the terms and conditions of the Settlement, including the fairness, adequacy and reasonableness of the Settlement.  Class Counsel will present their application for their fees and expenses pursuant to Rule 23(h), including administrative costs to be paid to the Claims Administrator, as well as for the service awards to the Class Representative and Class Service Members.  Accordingly, the Parties request that the Court schedule the final fairness hearing approximately three (3) months after authorizing distribution of notice of settlement.[30]

## V.        CONCLUSION

For the foregoing reasons, the Parties respectfully request that this Court enter an Order which:

(1)  certifies the Rule 23 Class for settlement purposes;

(2)  appoints Derek Amaral as Class Representative;

(3)  appoints Chip Muller, Esq., as Class Counsel;

(4)  directs distribution of the proposed Notice of Settlement and accompanying forms to all Class Members; and

(5)  sets a date for the final fairness hearing.

---

[30] As noted above, after a hearing on the instant motions is scheduled, the parties will confer with the Court's clerk to determine a specific date to recommend for the Final Fairness Hearing.

Respectfully submitted, this 15th day of May, 2014.

For the Plaintiffs,
By their Attorney,

*/s/* Chip Muller

Chip Muller, Esq. (BBO #672100)
MULLER LAW, LLC
155 South Main Street, Suite 101
Providence, RI 02903
(401) 256-5171 (Tel)
(401) 256-5178 (Fax)
chip@chipmuller.com

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the CM/ECF system, will be electronically sent to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 15, 2014.

/s/ Chip Muller
Chip Muller